# THE CONFEDERATE NOTE CASE.

THE ATLANTIC, TENNESSEE AND OHIO RAILROAD COMPANY, THE CHAR-
LOTTE AND SOUTH CAROLINA RAILROAD COMPANY, JOSEPH WILSON
AND ANDERSON MITCHELL,

*v.*

THE CAROLINA NATIONAL BANK OF COLUMBIA, SOUTH CAROLINA, L. D.
CHILDS, AND C. H. MANSON.

1. Notes issued by the Confederate government having become the currency
in which contracts were made and business conducted in the insurrec-
tionary States, during the recent civil war, and such notes having been
designated by general custom as notes for so many "dollars," parol
evidence is admissible, where suit is brought . . . to enforce a contract
payable in "dollars," and made during the war, to prove—the above
condition of things being first shown—that the term "dollars" as used
in the contract meant, in fact, Confederate notes. In the absence of
such evidence the presumption of law would be that by the term "dol-
lars," the lawful currency of the United States was intended. *Thor-
ington* v. *Smith* (8 Wallace, 1) explained.

2. The ordinance of North Carolina of 1865 declared that all existing con-
tracts solvable in money, whether under seal or not, made after the de-
preciation of Confederate currency, before the 1st day of May, 1865,
and then unfulfilled (except official bonds, and penal bonds payable to
the State), should "be deemed to have been made with the understand-
ing that they were solvable in money of the value of the said currency;"
but at the same time provided that it should be "competent for either
of the parties to show, by parol or other relevant testimony, what the
understanding was in regard to the kind of currency in which the same
were solvable," and that in such case "the true understanding" should
regulate the value of the contract. *Held,* That the understanding of the
parties might be shown from the nature of the transaction, and the
attendant circumstances, as satisfactorily as from the language used;
and particularly that it might be shown from the length of time during
which the contracts had to run before maturing; and that accordingly
when bonds of a railroad company were issued in May, 1862, payable
at dates varying from seven to thirteen years afterwards, the infer-
ence was justified that the company intended at the time of issuing
them, that the bonds should be paid in lawful money instead of Con-
federate notes.

3. The interest payable on a bond, issued as abovementioned, follows the
character of the principal, and is payable in like currency.

4. Usury, as a defence, must be specially pleaded or set up in the answer to
entitle it to consideration.

APPEAL from the Circuit Court for the District of North Carolina; the case being thus:

In May, 1862, the Atlantic, Tennessee and Ohio Railroad Company, a corporation chartered by the State of North Carolina, issued its coupon bonds, in sums of $500, to the amount of $151,000, payable at different periods from November, 1869, to November, 1875, with interest at the rate of six per cent. a year, payable semi-annually. The bonds were indorsed and their payment guaranteed by the Charlotte and South Carolina Railroad Company, a corporation also chartered by the State of North Carolina; and they stated on their face that they might be converted into the stock of the company issuing them, at par, by the holder. The bonds were payable to the company last abovementioned, or bearer, and were secured by a deed of trust of the railroad, buildings, and franchise of the company executed to Joseph Wilson and Anderson Mitchell. The deed stipulated that, in case the company failed to pay the principal and interest on the bonds as they became due, the trustees should, upon request of the holders of the bonds, or of their guarantor, proceed to sell the property, or so much thereof as might be necessary, and apply the proceeds of the sale to the payment of the bonds.

The Carolina National Bank, L. D. Childs, and C. H. Manson, having become the holders and owners of $25,000 of these bonds, and the railroad company having failed to pay either principal or interest, they requested the trustees to proceed and sell the property covered by the trust deed, and to distribute the proceeds pursuant to its provisions. With this request the trustees declined to comply, alleging as a reason that the parties differed as to the amount to be paid. The above-named holders of the bonds, accordingly filed a bill in the court below against the two railroad companies, and the trustees, Wilson and Mitchell, to enforce the execution of the trusts of the deed.

In their answer, the railroad companies averred that they had at all times been and now were both able and ready to adjust their debt to the complainants upon a just basis of

the value of their bonds and of the coupons due in lawful money of the United States, as soon as their value could be ascertained; but that the complainants demanded payment in full of said bonds and all accrued interest in the said lawful money, with which demand the defendants had refused to comply.

The trustees in their answer admitted that they had received notice from the complainants of the default of the Atlantic, Tennessee and Ohio Railroad Company, in paying its alleged debt to the complainants, and that for the payment thereof they, the trustees, had been requested to take steps for the sale of the property conveyed to them by the deed of trust; but that they had been prevented from so doing on account of the conflict between the complainants and the officers of the said company as to the measure of value of the bonds; the complainants claiming payment in full in lawful money of the United States, and the former asserting that the bonds were solvable in Confederate currency, and, as such, were legally liable to be scaled to their true value in money of the United States.

By a convention assembled in North Carolina in October, 1865, an ordinance was on the 18th of that month adopted, bearing the title of *"An ordinance declaring what laws and ordinances are in force, and for other purposes."* The third section was as follows:

"It shall be the duty of the General Assembly to provide a scale of depreciation of the Confederate currency from the time of its first issue to the end of the war; and all executory contracts, solvable in money, whether under seal or not, made after the depreciation of said currency before the 1st day of May, 1865, and yet unfulfilled (except official bonds and penal bonds payable to the State) shall be deemed to have been made with the understanding, that they were solvable in money of the value of the said currency; it shall be competént for either of the parties to show by parol or other relevant testimony, what the understanding was in regard to the kind of currency in which the same are solvable; and in such case, the true understanding shall regulate the value of the contract: *Provided,* That in case

the plaintiff in any suit upon such contract, will make an affidavit that it was solvable in other currency than that above referred to, then such presumption shall cease, and it shall be presumed to be payable in such currency as shall be mentioned in the affidavit, subject to explanation by evidence as aforesaid."

The legislature, on the 12th of March in the ensuing year, passed two acts connected with the subject. The first was as follows:

"*An Act relating to Debts contracted during the late War.*

"WHEREAS a great many debts, which were contracted during the war are yet unsettled, said debts having been incurred for property bought at irregular and extravagant prices, or for currency of a depreciated value. And whereas the late State convention made it obligatory on this General Assembly to provide a scale of depreciated currency for the settlement of these debts. And whereas this General Assembly finds great difficulty in fixing a scale which will secure justice to citizens of all sections of the State. And whereas, in the opinion of this General Assembly, no scale which will do justice to all sections of the State can be adopted, therefore,

"SECTION 1. Be it enacted, That in all civil actions which may arise in courts of justice for debts contracted during the late war, in which the nature of the obligation is not set forth, nor the value of the property for which said debts were created is stated, it shall be admissible for either party to show on trial by affidavit or otherwise, what was the consideration of the contract, and the jury in making up their verdict shall take the same into consideration and determine the value of said contract in present currency, in the particular locality in which it is to be performed, and render their verdict accordingly."

The second act, after reciting the terms of the ordinance, was entitled and enacted thus:

"*An Act to establish a scale of depreciation of Confederate currency.*

"Be it enacted, &c., That the following scale of depreciation be and the same is hereby adopted and established as the measure of value of one gold dollar in Confederate currency for each month, and the fractional parts of the month of December

1864, from the 1st day of November, 1861, to the 1st day of May, 1865, to wit:

*Scale of Depreciation of Confederate Currency, the Gold Dollar being the Unit and Measure of Value from November 1st, 1861, to May 1st, 1865.*

| Months. | 1861. | 1862. | 1863. | 1864. | 1865. |
|---|---|---|---|---|---|
| January, . . . . . . . . . . | . . . | $1 20 | $3 00 | $21 00 | $50 00 |
| February, . . . . . . . . . | . . . | 1 30 | 3 00 | 21 00 | 50 00 |
| March, . . . . . . . . . . | . . . | 1 50 | 4 00 | 23 00 | 60 00 |
| April, . . . . . . . . . . | . . . | 1 50 | 5 00 | 20 00 | 100 00 |
| May, . . . . . . . . . . . | . . . | 1 50 | 5 50 | 19 00 | . . . . |
| June, . . . . . . . . . . | . . . | 1 50 | 6 50 | 18 00 | . . . . |
| July, . . . . . . . . . . | . . . | 1 50 | 9 00 | 21 00 | . . . . |
| August, . . . . . . . . . | . . . | 1 50 | 14 00 | 23 00 | . . . . |
| September, . . . . . . . . | : . . | 2 00 | 14 00 | 25 00 | . . . . |
| October, . . . . . . . . . | . . . | 2 00 | 14 00 | 26 00 | . . . . |
| November, . . . . . . . . | $1 10 | 2 50 | 15 00 | 30 00 | . . . . |
| December, . . . . . . . . | 1 15 | 2 50 | 20 00 | . . . . | . . . . |
| December 1st to 10th, inclusive, | . . . | . . . | . . . . | 35 00 | . . . . |
| "    10th to 20th,    " | . . . | . . . | . . . . | 42 00 | . . . . |
| "    20th to 30th,    " | . . . | . . . | . . . . | 49 00 | . . . . |

In repeated instances, after the issue of the bonds and up to July, 1863, the officers of the Atlantic, Tennessee and Ohio Railroad Company in dealing in its bonds spoke of them as having a superior value, and as not being subject to the fluctuations of Confederate currency. The following was one instance of several.

The president, William Johnson, in March, 1863, upon a settlement as guardian of his ward, upon his coming of age, paid over to him thirteen of these bonds, and assured him at the time that they were worth more than their face in good money, and that he would put nothing of a Confederate value upon him; that they were so good that he would not let him have them unless he would also take $5000 of the stock of the company. The ward took the bonds and stock at their par value. This was less than one year from their date.

The treasurer, who countersigned these bonds, seemed never to have "understood" that they were to be charged as Confederate paper, and a subsequent treasurer stated that this view of the subject was never taken by the officers or

board of directors until May, 1870, when the president decided that the bonded debt was subject to the Confederate scale. Prior to that time, under the supervision of the president, he had submitted his printed exhibits of the condition of the company, stating their bonds as liabilities at their "face value." These exhibits were approved by the stockholders in convention assembled.

The Circuit Court, after declaring "that the bonds and coupons issued by the Atlantic, Tennessee and Ohio Railroad Company, in the pleadings mentioned, were not issued as payable in the paper currency of the late Confederate States, and are not subject to any deduction on that account, but that the same are payable in good and lawful money of the United States, and should have been discharged in such money when payment was demanded of said railroad company," decreed a reference to the clerk to ascertain the amount due the complainants, and others holding similar bonds of the company, and that upon default in payment of the amount found due for thirty days after report made and notification thereof, the property described in the trust-deed be sold by the trustees, and that the proceeds upon confirmation of the sale be applied by them, after discharging the expenses of executing their trust, to the payment of the amount reported due. From this decree the defendants appealed to this court.

*Mr. W. W. Boyce, for the appellants:*

Obligations simply to pay "dollars" during the war, made within the Confederate States, should be taken to intend Confederate currency. That currency was the only currency in general use. All taxes, all salaries, all debts were paid in it. The army was paid in it; trust funds were invested in it; the banks received and paid it out universally. Contracts during that period were based on it.* In the disordered condition of the currency, the presumption of the

* Pharis *v.* Dice, 21 Grattan, 309; Hilb *v.* Peyton, Ib. 395; Walker *v.* Pierce, Ib. 726; Hale *v.* Wilkinson, Ib. 88; Dearing's Admr. *v.* Rucker, 18 Id. 439; Neely *v.* McFadden, 2 Richardson's Law (New Series), 174.

common law as to promise to pay "dollars" would have been a presumption contrary to fact. The form of almost every contract to pay Confederate money was to pay so many "dollars" generally, but certainly no one supposed that the dollars intended were dollars in Federal money.

*Thorington* v. *Smith,*\* in this court, seems to settle the question in issue. This court, speaking by Chase, C. J., and referring to these Confederate notes there says:

. . . " *They were the only measure of value which the people had, and their use was a matter of almost absolute necessity. In the light of these facts, it seems hardly less than absurd to say that these dollars must be regarded as identical in kind and value with the dollars which constitute the money of the United States. We cannot shut our eyes to the fact that they were essentially different in both respects.*"

The ordinance of the convention of North Carolina of October, 1865, establishes, as a presumption of law, that contracts to pay "dollars" made during the war, are presumed to be payable in Confederate currency, subject to evidence of a different intent. And the valuation by statute of North Carolina of value of Confederate currency for month of May, 1862, shows that the demand of the complainants is unreasonable.

The learned counsel then went into argument based on a special history, which he gave of the bonds, to show that if payable in full, in lawful money of the United States, they were void as usurious.

[In view of the decision hereinafter made, p. 560, on the point thus set up, the Reporter has not in his statement given any special history of the bonds; and now does not give any argument on the point as made.]

*Mr. H. W. Guion, contra,* who contended among other things—if the facts of the case did not repel all presumptions that the bonds were payable in Confederate notes, and if these bonds were within the meaning of the statutes of

---

\* 8 Wallace, 13.

North Carolina—that those statutes impaired the obligation of contracts, and so were unconstitutional; that the parties had made in 1862 a contract, using in it the well-known word of "dollars;" that it was for the courts to interpret the meaning of the word in accordance with the settled rules of law and evidence; that these acts passed in 1866 changed this state of things, and assumed that the parties meant not what the words, judicially interpreted, declared, but what the legislature determined to be the presumable and presumed meaning; that the acts put the whole burden of proof upon him who previously was not called on to make any proof; that they thus changed both the meaning which the law gave to words, the tribunal which should settle that meaning and the rules of evidence to ascertain it; that the acts were retrospective; operating on existing contracts, and as a practical result converting valuable securities into worthless paper.

Mr. Justice FIELD, after stating the case, delivered the opinion of the court, as follows:

The question presented, and the sole question under the pleadings, is whether the bonds issued in May, 1862, of the Atlantic, Tennessee and Ohio Railroad Company, a corporation created by the State of North Carolina, were solvable in Confederate notes or in the legal currency of the United States. The company, in its answer, expresses a readiness to pay in legal currency the equivalent of the bonds, if their values be estimated upon the assumption that the bonds were payable in Confederate notes.

In support of the position taken by the company, and the trustees representing the company, reliance is placed upon the decision of this court in *Thorington* v. *Smith*,* and the ordinance of North Carolina of October, 1865, relating to contracts made during the war, and the Scaling Act of the State passed in 1866.

The treasury notes of the Confederate government were

---

* 8 Wallace, 1.

issued early in the war, and, though never made a legal tender, they soon, to a large extent, took the place of coin in the insurgent States.   Within a short period they became the principal currency in which business in its multiplied forms was there transacted.   The simplest purchase of food in the market, as well as the largest dealings of merchants, were generally made in this currency.   Contracts thus made, not designed to aid the insurrectionary government, could not, therefore, without manifest injustice to the parties, be treated as invalid between them.   Hence, in *Thorington* v. *Smith*, this court enforced a contract payable in these notes, treating them as a currency imposed upon the community by a government of irresistible force.   As said in a later case, referring to this decision, " It would have been a cruel and oppressive judgment, if all the transactions of the many millions of people composing the inhabitants of the insurrectionary States, for the several years of the war, had been held tainted with illegality because of the use of this forced currency, when those transactions were not made with reference to the insurrectionary government."[*]

The Confederate notes, being greatly increased in volume from time to time as the exigencies of the Confederate government required, and the probability of their ultimate redemption growing constantly less, necessarily depreciated in value as the war progressed, until, in some portions of the insurgent territory, at the close of the year 1863, $20 in these notes, and at the close of the year 1864, $40 possessed only the purchasing power of $1 in lawful money.[†]   The precious metals, however, still constituted the legal money of the insurgent States, and alone answered the statutory definition of dollars, but in fact had ceased in nearly all, certainly in a large part of the dealings of parties, to be the

---

[*] Hanauer *v.* Woodruff, 15 Wallace, 448.

[†] According to the Scaling Act of North Carolina one dollar in gold in that State was worth, at the close of 1863, twenty dollars, and at the close of 1864, forty-nine dollars in Confederate notes.  According to the Scaling Act of South Carolina one dollar in gold in that State was worth at those periods respectively, thirteen dollars and ninety cents and twenty-two dollars and twenty-two cents in Confederate notes.

measures of value.   When the war closed, these notes, of course, became at once valueless and ceased to be current, but contracts made upon their purchasable quality, and in which they were designated as dollars, existed in great numbers.   It was at once evident that great injustice would in many cases be done to parties if the terms used were interpreted only by reference to the coinage of the United States or their legal-tender notes, instead of the standard adopted by the parties.   The legal standard and the conventional standard differed, and justice to the parties could only be done by allowing evidence of the sense in which they used the terms, and enforcing the contracts thus interpreted. The anomalous condition of things at the South had created in the meaning of the term "dollars" an ambiguity which only parol evidence could in many instances remove.   It was, therefore, held in *Thorington* v. *Smith*, where this condition of things, and the general use of Confederate notes as currency in the insurgent States were shown, that parol evidence was admissible to prove that a contract between parties in those States during the war payable in "dollars," was in fact made for the payment of Confederate dollars; the court observing, in the light of the facts respecting the currency of the Confederate notes, which were detailed, that it seemed "hardly less than absurd to say that these dollars must be regarded as identical in kind and value with the dollars which constitute the money of the United States."

The decision upon which reliance is placed, as thus seen, only holds that a contract made during the war in the insurgent States, payable in Confederate notes, is not for that reason invalid, and that parol evidence, under the peculiar condition of things in those States, is admissible to prove the value of the notes, at the time the contract was made, in the legal currency of the United States.   In the absence of such evidence the presumption of law would be that by the term "dollars," the lawful currency of the United States was intended.   This case affords, therefore, no support to the position of the appellants here, for no evidence was produced by them that payment of the bonds in Con-

federate notes was intended by the railroad company when they were issued, or by the parties who purchased them.

The ordinance of North Carolina of October, 1865, recognized the difference between the standard of value existing in that State during the war, and usually referred to in the contracts of parties, and the legal standard adopted by the government of the United States. It required that the legislature should provide a scale of depreciation of the Confederate currency from the time of its first issue to the end of the war; and declared that all existing contracts solvable in money, whether under seal or not, made after the depreciation of that currency, before the 1st day of May, 1865, and then unfulfilled (except official bonds, and penal bonds payable to the State), should "be deemed to have been made with the understanding that they were solvable in money of the value of the said currency;" but at the same time provided that it should be "competent for either of the parties to show, by parol or other relevant testimony, what the understanding was in regard to the kind of currency in which the same were solvable," and that in such case "the true understanding" should regulate the value of the contract. The act of the legislature of the State, passed in 1866, adopted a scale of depreciation of Confederate currency as required by the ordinance, designating the value in such currency of the gold dollar on the first day of each month, from November, 1861, to April, 1865.

The ordinance and act require the courts, in the construction of contracts made in the insurgent States between certain dates, to assume as a fact that the parties intended by the term "dollars" Confederate notes, and understood that the contracts were solvable in that currency; and they thus throw upon the party contesting the truth of the assumed fact the burden of establishing a different understanding. It is contended by the complainants that the ordinance and statute in thus giving a supposed conventional meaning to the terms used, in the absence of any evidence on the subject, instead of the meaning which otherwise would attach to the terms, impair the obligation of the contracts

between them and the railroad company, and are, therefore, void. Upon this question we refrain from expressing any opinion. It is unnecessary that we should do so, for there is sufficient in this case to rebut the presumption required by the ordinance and statute.

The understanding of the parties may be shown from the nature of the transaction, and the attendant circumstances, as satisfactorily as from the language used. A contract, for example, to pay $50 for a night's lodging at a house of public entertainment, where similar accommodation was usually afforded for one-twentieth of that sum in coin, accompanied by proof of a corresponding depreciation of Confederate notes, would leave little doubt that the parties had Confederate money in contemplation when the contract was made. In *Thorington* v. *Smith* the land was sold for the nominal sum of $45,000, when its value in coin was only $3000, a most persuasive fact to the conclusion that Confederate notes were alone intended in the original transaction. So, on the other hand, contracts made payable out of the Confederate States, or at distant periods, such as may be supposed to be desired as investments of moneys, or given upon a consideration of gold, would, in the absence of other circumstances, justify the inference that the parties contemplated payment in the legal currency of the country.

In the present case the intention of the railroad company that the principal of its bonds should be paid in lawful money instead of Confederate notes may justly be inferred, we think, from the nature of the contracts, particularly the long period before they were to mature. When they were issued, in May, 1862, it could not have been in the contemplation of the parties that the war would continue from seven to thirteen years. It is well known that at that time it was the general expectation on all sides that the war would be one of short duration. The Confederate notes were only payable by their terms after a ratification of peace between the Confederate States and the United States. The bonds of the railroad were intended for sale in the markets of the world generally, and not merely in the Confederate States;

they were payable to bearer, and, therefore, transferable by delivery. They state on their face that they may be converted into the stock of the company, at par, by the holder. The declarations of the officers of the company up to July, 1863, show that the company treated the bonds as having an exceptional value, and not subject to the fluctuation of Confederate currency. Repeated declarations of the officers were made to that import.

There is sufficient in these circumstances to repel the presumption created by the ordinance and act of North Carolina, and that being repelled, the ordinary presumption of law as to the meaning of the parties in the terms used must prevail.

With reference to the interest payable semi-annually a different presumption cannot be allowed, as the interest must follow the character of the principal.

The other questions presented by counsel are not raised on the pleadings. Usury, as a defence, should have been specially pleaded or set up in the answer to entitle it to consideration..

DECREE AFFIRMED.