## DUGGER v. BOCOCK.

Inasmuch as a Federal question is not involved in the determination of the case, this court has no jurisdiction to re-examine the decree of a State court dismissing a bill brought by the vendor of lands in Alabama, who prayed that the sale of them be set aside solely on the ground that two instalments of the purchase-money had been paid in the treasury notes of the Confederate States and the last in Confederate bonds, the notes having been received in the usual course of business, and the bonds under such circumstances as almost amounted to coercion.

ERROR to the Supreme Court of the State of Alabama. The facts are stated in the opinion of the court.

*Mr. Samuel Field Phillips* for the plaintiffs in error.
*Mr. Michael L. Woods* for the defendants in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a suit in equity begun by the appellants, two of the children and heirs of Henry Dugger, deceased. The case, which was decided on demurrer to the bill, may be stated generally as follows : —

Henry Dugger, a citizen of Alabama, died in 1852, leaving Alice G. Dugger, his widow, and eight children, of whom the present appellants were the youngest. The widow was appointed by the Probate Court of Marengo County administratrix of the estate, which consisted of lands and personal property. The estate being free from debt, she, on the 3d of September, 1860, filed her petition in the Probate Court for leave to sell the lands for the purposes of distribution. The proper order was made, and on the 19th of November they were sold to Willis P. Bocock, one of the appellees, at $42.01 an acre, amounting in the aggregate to $28,806.40, for which he gave her his three notes with sureties, one for $10,370.30, payable Nov. 19, 1861, another for $11,138.47, payable Nov. 19, 1862, and the other for $11,906.64, payable Nov. 19, 1863. The sale was reported to and confirmed by the court, but under the law of Alabama the legal title to the lands did not pass from the heirs to the purchaser until the purchase-money was paid, and a conveyance actually made under an order of the court for that purpose. Until such a conveyance, the heirs

might maintain ejectment for the recovery of possession if the conditions of the sale were not complied with. *Doe* v. *Hardy,* 52 Ala. 297.

It is averred in the bill " that although said Willis P. Bocock was the ostensible purchaser of the whole of said land, yet, by some arrangement between him and said Henry A. Tayloe, made before or at the time of said purchase, said Tayloe obtained by the understanding with Bocock the one hundred and ninety-six acres of land before mentioned, and undertook with said Bocock to pay the purchase-money for the same at the rate aforesaid, and said Tayloe went into and has since had possession thereof." The present suit is brought with reference to this one hundred and ninety-six acres only, the whole property sold consisting of something more than six hundred and forty acres.

The bill then proceeds to state as follows : —

" VI. Your orator and oratrix further show to your Honor that neither said Bocock nor any one else has ever paid the purchase-money evidenced by said notes, or any part thereof, according to the terms of his purchase, or in any manner, except as hereinafter stated, and the purchase-money for said one hundred and ninety-six acres, with interest thereon, remains wholly unpaid.

" VII. That said Bocock took up the said two notes first falling due with Confederate States treasury notes, and the said note last falling due he took up by handing over to Mrs. Alice G. Dugger bonds of the Confederate States. Your orator and oratrix, who were then infants, state, upon information and belief, that Bocock and the defendant Henry A. Tayloe together urged said Alice G. Dugger to accept said Confederate notes and bonds in payment of said Bocock's notes, at a time when all of her children who were of age were absent from home, and the said Alice G. Dugger received such Confederate notes for the note first falling due without remonstrance ; she reluctantly yielded and received the Confederate notes for the note secondly falling due, but when they urged her to accept the said treasury notes or Confederate bonds for the last note, she peremptorily refused to accept said Confederate notes and bonds, which were then really almost worthless, in payment of

said note, and for a long time she continued to refuse, and sent the said Bocock and Tayloe away without taking the offer; but she had great confidence in and esteem for said Bocock and Tayloe, who were her neighbors, and were men of high character, and they brought great pressure to bear on her to induce her to take the Confederate notes or bonds. They represented to her that she would be ruinously taxed by the Confederate government if she refused to take Confederate money in payment of said note, and that she would be made to pay the tax in gold, and they or one of them reported her refusal to the Confederate tax-collector, who called upon her and told her he was informed of her refusal, and finally, under great pressure, under protest, and unwillingly, the said Alice G. Dugger very reluctantly yielded and took said Confederate bonds, and gave up to said Bocock said last note. The sons of Alice G. Dugger then of age were absent in the army."

Payment of the purchase-money was never reported in form to the court by Mrs. Dugger, and no order was ever made for her to convey the property. Neither did she ever execute any conveyance, but at the April Term, 1864, of the court she filed her final account as administratrix, in which she charged herself with the purchase-money, making no mention of the fact that it had been paid in the notes and bonds of the Confederate States. This account was audited and settled by the court, and a distribution ordered. The balance found due from the administratrix was $40,170.41, of which the share of each distributee was $5,021.30. These appellants were then infants, and the record shows that in the proceedings for settlement and distribution they were represented by H. A. Woolf. Mrs. Dugger was at the time their guardian, and she charged herself in her accounts as guardian, which were then pending before the court for partial settlement, with the distributive shares of her wards.

In 1866, after the close of the war, no conveyance having been made to Bocock, Mrs. Dugger and her surviving children, including the present appellants, who were still infants, commenced in one of the State courts of Alabama a suit, in the nature of an action of ejectment, against Bocock and Tayloe to recover the lands. Fearing that an attempt would be made by the defendants to get a deed, the widow and heirs, on the

12th of May, 1866, filed in the Probate Court their protest against any order to that effect; but the bill avers that Bocock did, " for the express purpose of defeating said action at law, on the twenty-first day of March, 1868, file his petition in said Probate Court, . . . wherein he represented and stated that he had paid the whole purchase-money for said lands, when in fact he had never paid it, or any part thereof, otherwise than in Confederate States treasury notes and bonds, as already herein set forth in detail, and further setting forth in his petition that the said Alice G. Dugger had not reported such payment, though more than a reasonable time had elapsed for her to have done so, and praying that an order for a conveyance of said lands to him might be made ; and said Probate Court, notwithstanding said caveat and protest filed by the heirs-at-law of said Henry Dugger, deceased, long before that time, and which was then on file, and without notice to the administratrix or to any of the said heirs, and without the knowledge by them of said application, and upon *ex parte* proof made by said Bocock, did appoint Henry A. Woolf, a brother of the judge of said court and an entire stranger to the estate, having no interest therein or knowledge of the affairs thereof, to execute titles to said Bocock, and said Woolf, in compliance with said order and decree of said court, made conveyances of said lands to said Bocock, without notice to or knowledge by the administratrix. . . . And the said action in the nature of ejectment brought by said heirs was defeated by the production of said conveyance, on the ground that the remedy was by direct proceedings in chancery to impeach said order or decree."

On the 11th of June, 1868, after Bocock got his deed, the widow and children, the appellants being represented by their guardian, entered into an agreement of compromise with Bocock, by which, " in full and final compromise and settlement of the claims between the parties, . . . touching and concerning their claims and rights in and to the lands hereinafter mentioned, and of the suits between them in respect thereto, and of the damages, rents, and mesne profits," the widow and children agreed to convey to Bocock a certain portion of the lands, and he to convey to them the rest, except the one hundred and ninety-six acres now in dispute. By an express stipulation

nothing in that compromise was "to impair or affect any right, title, or claim of any or either of the parties of the second part [the widow and children] to any lands in possession of said Henry A. Tayloe, or to rents and damages for the use thereof by said Tayloe, or to any action pending against Tayloe."

This agreement was in all respects ratified by the appellants after they came of age, but on the 31st of October, 1873, they began this suit to reach the one hundred and ninety-six acres held by Tayloe, and as to him they made the following averments:—

"Your orator and oratrix have but imperfect knowledge or information of the exact arrangement by which said Tayloe obtained the same, or whether he has the same in his own name or in the name of some other person, and pray that said Bocock and Tayloe and Maupin may answer and set forth how and in what manner the same was acquired and is held by them, or either of them, and also what said Tayloe and Maupin, and each of them, paid for it, and in what sort of money or currency; and your orator and oratrix state upon information and belief that the Confederate currency and bonds with which said Bocock took up his notes was furnished by said Tayloe to the amount of the purchase-money for said one hundred and ninety-six acres, and that said payment, though made in Bocock's name, was in full to the extent of the amount due for said one hundred and ninety-six acres made in part by said Tayloe.

"XVI. Your orator and oratrix charge that said Tayloe paid nothing for said land except Confederate money and bonds, which were not a valuable consideration as against your orator and oratrix, who were then minors; and they further say that said Tayloe well knew that said Bocock had paid only Confederate notes and bonds for said lands; and on information and belief they charge that he participated with said Bocock in said wrong and injury to your orator and oratrix. And your orator and oratrix show that said Maupin is the son-in-law of said Tayloe, and lives with him; that he married the daughter of said Tayloe in 1864 or 1865, and that he has no title to said land, and is not a purchaser for value, and that he acquired whatsoever rights he may have with full knowledge or notice

that nothing but Confederate notes and bonds had been paid for said land."

The prayer of the bill is as follows: —

" To the end, therefore, that an account may be taken of the amount due to your orator and oratrix, respectively, as their several portions of money arising from the sale of said one hundred and ninety-six acres of land, as heirs-at-law of said Henry Dugger, deceased, and as heirs-at-law of said John W. Dugger, deceased, and that payment of the same may be enforced against said one hundred and ninety-six acres of land, and against the rents thereof, to accrue from the filing of this bill, and that said lands may be sold therefor, and that the decree for titles to said Bocock, and the deed made thereto, may be held void, or, if not, that it may be set aside, or held to be subordinate to your orator's and oratrix's lien, and that your orator and oratrix may have such other and further relief as to your Honor may seem proper and as justice may require.

The Supreme Court of the State having affirmed the decree of the court below dismissing the bill, the case has been brought here upon a writ of error allowed by the chief justice of that court. A motion to dismiss for want of jurisdiction has been made, which now stands for hearing with the case on its merits.

The only averments in the bill that can by any possibility raise a Federal question are those which relate to the payments in the notes and bonds of the Confederate States. In *Delmas* v. *Insurance Company* (14 Wall. 661), we said distinctly that a Federal question was not necessarily involved in a case because the consideration of a contract to be enforced was Confederate money, and Mr. Justice Miller, speaking for the court, said: " When a decision on that point, whether holding such contract valid or void, is made upon the general principles by which courts determine whether a consideration is good or bad on principles of public policy, the decision is one we are not authorized to review. Like in many other questions of the same character, the Federal courts and the State courts, each within their own spheres, deciding on their own judgment, are not amenable to each other." This case was followed in *Tarver* v. *Keach*, 15 Wall. 67; *Rockhold* v. *Rockhold*, 92 U. S. 129;

*New York Life Ins. Co.* v. *Hendren,* id. 286 ; *Bank* v. *McVeigh,* 98 id. 332.

In *Thorington* v. *Smith* (8 Wall. 1), a case which came up from one of the District Courts of the United States for Alabama, the question arose whether contracts for the payment of Confederate notes made during the late rebellion, between parties residing within the Confederate States, could be enforced in the courts of the United States, and we held that they could, if made in the usual course of business, and not for the purpose of giving currency to the notes, or otherwise aiding the rebellion. The Chief Justice, in delivering the opinion of the court, said, in speaking of these notes : " As contracts in themselves, except in the contingency of successful revolution, these notes were nullities, for except in that event there could be no payer. They have, indeed, that character on their face, for they were payable only ' after a ratification of a treaty of peace between the Confederate States and the United States of America.' While the war lasted, however, they had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency imposed on the community by irresistible force." And, further on, in reference to contracts stipulating for payment in this kind of currency : " They have no necessary relations to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection." Such is now the settled rule of decision in this court. *Delmas* v. *Insurance Company, supra; Confederate Note Case,* 19 Wall. 548; *Wilmington & Weldon Railroad Co.* v. *King,* 91 U. S. 3; *Stewart* v. *Salamon,* 94 id. 434.

In *Hanauer* v. *Woodruff* (15 Wall. 439), it was held that " the war bonds issued by the secession ordinance of Arkansas, though used as a circulating medium in that State and about Memphis, did not constitute any forced currency which the people in the State and city were obliged to use," and " that they were only a circulating medium in the sense that any

negotiable money instruments, in the payment of which the community has confidence, constitute a circulating medium." For this reason we decided in that case, which came up from the Circuit Court of the United States for the Eastern District of Arkansas, that a note given in the purchase of such bonds could not be enforced in the courts of the United States. Mr. Justice Field, in delivering the opinion of the court, stated the difference between that case and *Thorington* v. *Smith* to be " the difference between submitting to a force which could not be controlled, and voluntarily aiding to create that force."

In the light of these cases it is easy to see that this bill does not necessarily involve the decision of any Federal question. There is no pretence that the parties intended, in the payments that were made, to aid the rebellion. Neither is it alleged that the first and second notes were paid in any other than the usual course of business. As to the third, the utmost that can be claimed from the allegations is, that Mrs. Dugger was forced against her will to accept the Confederate bonds and give up the note. There can be no doubt that under our decisions the payment of the first and second notes was good, if she was authorized by law to accept anything else than lawful money. About the third, the question presented was, apparently, not as to the validity of the Confederate bonds, but as to the effect of the coercion employed to get them taken. None of these are Federal questions. Neither is the further one, whether a payment good as to her would be good as to these appellants. All these questions are of a class as to which the judgment of the State court is final and not reviewable here.

The rule in relation to our jurisdiction is that it must either appear from the record in express terms that there has been a decision against the right claimed under the Constitution, laws, or treaties of the United States, or that the judgment or decree complained of could not have been given without so deciding. *Murray* v. *Charleston*, 96 U. S. 432. Here there are no averments in the bill which directly present the validity under the laws of the United States of a payment in Confederate securities, and it may fairly be inferred that the appellants relied upon an entirely different ground for the relief they asked. Such being the case, no Federal question was necessarily in-

volved in the decision that has been made. As the burden is on the appellants to show our jurisdiction, and we cannot entertain the case unless they have done so, the writ of error is

*Dismissed.*