## MELLEN and another *v.* FORD and others.

(*Circuit Court, W. D. Tennessee.* September 18, 1886.)

1. EVIDENCE—PAROL EVIDENCE—CONTRACTS IN WRITING—AMBIGUITIES.

    The mere use, in a document, of the same word to express different meanings. does not create such an ambiguity in the contract as to let in parol proof, if it appear by the context of the contract itself in which particular sense the parties used the disputed word.[1]

2. CONTRACT—"PLASTERING AND STUCCO WORK" INCLUDES LATHING.

    Where the specifications of a building contract contained a general heading or title called "Plastering," under which, in subtitles called "Deafening,"

[1] See note at end of case.

"Lathing," and "Plastering," the whole title is described, and a contractor undertook "to do the plastering and stucco work" according to the specifications, there is no ambiguity raised by the double use of the word "Plastering," and it will be construed to mean all included under the general title, and not that alone described under the subtitle "Plastering;" and this, although the specifications call for wire lathing, and not the ordinary wooden slip.

## Attachment Case.

This case was removed from the state court, where it was in form a bill in equity, but in fact a suit at law upon the contract, attaching the effects of a non-resident. By consent the parties did not replead, and by stipulation the case was tried by the court without a jury. The contract involved was a building contract, and the facts are stated in the opinion; but, as it is a construction of the language of the instrument, the whole document is inserted here, in order to aid in understanding the rulings of the court.

### "EXHIBIT A TO BILL.

"On the thirtieth of April, 1884, a written contract, executed in duplicate, was entered into between Pierce & Morgan, (Charles Pierce and Thomas Morgan,) of Indianapolis, Indiana, of the one part, and M. J. Ford, of Louisville, Kentucky, of the second part, which contract between the parties is still a valid and subsisting contract, and wherein it is agreed by the said Pierce & Morgan, as complete and original contractors for the erection of the Memphis Cotton Exchange at Memphis, Tennessee, to and with the said Ford, that for the sum of seven thousand five hundred dollars to be paid by said Pierce & Morgan to said Ford the said Ford undertook and agreed to do and perform, as subcontractor, the plastering and stucco work required by the plans and specifications for the said building as prepared by H. Walters, architect of Louisville, Kentucky, and in strict conformity therewith, as well as to do and furnish all labor, workmanship, and materials required to do the plastering and stucco work necessary in the erection and completion of said building; and, as payment therefor, the said contract recites that the said Ford is to receive the aforementioned sum, in the following manner, viz.: Ninety per cent. of the amount of the value of the work done will be paid during the progress of the work, said value to be based on monthly estimates of the amount of the work done, and the payments to be made every thirty days; and after the work has been completed the balance of the amount of the contract and extra work will be paid for. It is further provided in the said contract that if, during the progress of the said work, or at any other time, changes are made in the specifications and plans either in the quantity or quality of the work, whereby the amount or cost of said work or plastering is increased beyond the sum stipulated, such changes are to be acceded to and executed by said Ford without vitiating or violating the said contract, and that the value of all such changes shall be added to said contract price, and be paid for by said Pierce & Morgan in the same manner as the original amount is agreed to be paid. And the said contract further provides and contemplates that the work thereinbefore set out shall be under the supervision of said Walters, or his assistant, and that he or such assistant shall have power to accept or refuse to accept any or all of such work, as is customary when compared with the requirements of the said plans and specifications already referred to. The aforesaid recitals and premises considered, it is agreed by and between said M. J. Ford, of Louisville, Kentucky, of the first part, and Hugh and Thomas Mellen, of the second part, that for and in consideration of one dollar cash in hand paid, the receipt of which is hereby

acknowledged, the said party of the first part agrees to and with said second parties that he will allow and permit them to do the said plastering and stucco work on the said Memphis Cotton Exchange, as set out in the first part of this instrument, on the following agreements and conditions; that is to say:

"(1) The said second parties are to furnish all labor, workmanship, and materials, and to do and complete the work hereinbefore set out, being the work defined and contemplated by the said plans and specifications, in a first-class, workman-like manner, and as rapidly as is consistent with first-class work when the building is ready for them to begin on.

"(2) Should there at any time be any extra work to be done, as is contemplated by the contract between said Ford and said Pierce & Morgan, as is set out in the premises hereof, the said Ford reserves to himself the right to do any and all of such extra work, or to permit the second parties hereto to do it, but only upon terms to be agreed upon at the time such extra work is ordered.

"(3) The said work now agreed to be done by said second parties shall be done and executed by them according to the said plans and specifications named, and in strict conformity therewith, under the supervision of said Walters, architect, or his assistant, as well as under the supervision of said Ford. The said Ford reserves this right to himself, for the reason that he is answerable over to said firm of Pierce & Morgan, his principals.

"(4) Should said second parties at any time fail or neglect to do or execute said work, or fail, neglect, or refuse to furnish or complete the same according to the said plans and specifications, they are to forfeit any sum of money due, unpaid, or to become due thereon, as is set out in No. 6 hereof; and the said Ford is given the right to rescind and annul this contract, and all rights thereunder, at his option, without notice to said second parties, and may then, by himself or others, proceed to and complete said work.

"(5) The said Ford is to pay all bills incurred by said second parties with material-men for or on account of materials, goods, or supplies furnished or used in the doing and completing of the work herein referred to, which payments are to be made by him each thirty days, and, when so paid by him, he shall be credited therefor on the payments to be made by him to said second parties, as is set out in No. 6 hereof; and the wages of the mechanics and laborers employed are to be paid by the said Ford also when due.

"(6) In consideration of the prompt and faithful performance of the foregoing terms, agreements, and conditions, the said Ford promises and agrees to and with the said second parties that he will pay them five thousand seven hundred dollars in the following manner, viz.: Ninety per cent. of this amount of the value of the work done will be paid during the progress of the work, said value to be based on monthly estimates of the amount of work done, and the payments to be made every thirty days; and, after the work has been completed and accepted by Pierce & Morgan, and Walters, architect, the balance of the percentum will be at that time paid. This undertaking on the part of said Ford to pay said sum of five thousand seven hundred dollars is in no manner a personal undertaking or liability, for it is agreed that said second parties are to look to said building and its owners for any sum of money due them; but said Ford binds and obligates himself in the first instance, and then only, to pay said second parties their proper share of sums of money received by him on account of the estimates paid for work done, and said Ford is bound to this extent only.

"(7) The change of the original specifications and drawings concerning stucco work in the two exchange rooms is to be made by the said second parties without extra charge.

"In testimony of all which, witness our hands, at Louisville, Kentucky, this fourteenth day of January, 1885.  M. J. FORD.

"HUGH & THOS. MELLEN."

*Frayser & Scruggs*, for plaintiffs.
*Finlay & Peters*, for defendants.

HAMMOND, J. The reliance of the defendants on the written contract is well founded. The affairs of men would be unstable beyond endurance if, after reducing their agreements to writing, the courts permitted thém to wrangle over all the circumstances preceding and subsequent to the writing in a struggle for some interpretation, more or less favorable to the one side or the other, of words that are elastic enough to excite the ingenuity of the parties or their counsel. And it may be remarked that very few of the words of our language, in use in the ordinary commercial dealings of men with each other, have an inflexible meaning, as one may see who will look over any collection of adjudicated words and phrases. I have not been able to find the word "plastering," as used in building contracts, defined by any court; but in *Higgins* v. *Lee*, 16 Ill. 495, under that general title, was included "lathing," and it was held that plastering, without it, on bare walls, was a departure from the contract, and, if done by consent, the defendant was entitled to have the cost of the lathing deducted; and in *Walls* v. *Bailey*, 49 N. Y. 464, in a contract "to do the plastering work," there was an agreement to pay the owner for all laths supplied by him at the invoice price. These are not adjudications of the point we have in this case, for there was no dispute about the meaning of the terms employed; but they serve as illustrations of the fact that in other contracts lathing has been treated as a part of the "plastering" or "plastering work," and I think it is so commonly understood in the parlance of both builders and their customers. Just as if one should engage another to paint a picture, it might be generally understood, in the absence of any stipulation to the contrary, that the painter should furnish the canvas or other foundation for the "painting" as a part of it,—which, in the construction of a statute, the porcelain foundation was held to be, in *Arthur* v. *Jacoby*, 103 U. S. 677,—though no one could possibly infer from a contract to paint a house that the contractor should furnish the walls to be painted, any more than such an implication could be raised from a contract to plaster it.

The definitions of the léxicographers do not exclude the lathing as part of the "plastering," though it is plain it is not necessarily included. "The act of covering walls, ceilings, etc., with plaster," Worcest. Dict. "Plaster" is a "composition of lime, sand, and hair or straw, and water, employed in overlaying the interior and exterior faces of walls; mortar; stucco; cement." Id. "Lath" is defined to be a "thin strip of wood nailed to studs and furring to support plastering." Id. The definitions in Webster are substantially the same, except he defines "plastering" as "the plaster work of a building; a covering of plaster." Webst. Dict. "A mixture of lime, hair, and sand *to cover lath-work* between timbers or rough walling," etc. 2

Encyc. Brit. (9th Ed.) p. 470, tit. "Architecture," sub-tit. "Plastering." "The carpenter's work *being completed*, strong batten laths are nailed up, etc., as laths are in England." 4 Encyc. Brit. 454, tit. "Building," subtit. "Ceilings." Again: "His materials are *laths, lath-nails,* lime, sand, hair, etc., (Id. subtit. "Plaster-work," p. 504;) and "when *the lathing* is completed, the work is either laid or pricked up," etc., (Id. subtit. "Plastering on Laths," p. 505.) Finally: "But lathing and plastering on laths, as practiced in England, is at best a very flimsy affair, and greatly requires improvement." etc. This book commends the French work, with stronger laths, wider apart, and does not seem to know of our American *wire* lathing, and describes the process of "plastering on walls" and "stucco work." Id. 505, 506.

From Gwilt's Encyclopedia of Architecture, (page 587, tit. "Plastering,") I quote:

"When a wall is to be plastered, it is called 'rendering.' In other cases the first operation, as in ceilings, partitions, etc., is *lathing*,—nailing the laths to the joists, quarters, or battens, [full directions for lathing are then given.]" Section 2238.

"After lathing, the next operation is *laying*, more commonly called 'plastering.' It is the first coat on laths. * * * On brick-work it is also the first coat, and is called 'rendering.'" etc. Section 2238.

From Clough's Contractors' Manual, p. 41, I find the subdivisions of "Plaster, Mason's Work," include "Particulars Relative to Lathing and Plastering," "Plastering on Brick-work," "Lath and Plaster," "Stucco Reveils," "Deafening," etc.; and that "plasterer's work to be charged by the day" includes "laths per hundred and nails per pound," etc.

From another source I quote:

"Plastering is applied directly upon walls of brick and mortar, the joints of which are left rough, that it may the better adhere; or upon a surface of laths, which are flat, narrow strips of wood securely nailed to the joists, rafters, or studs, parallel to each other, and so close together that but little space (usually ¼ inch) is left for the mortar to get between them. That which passes through spreads and hardens in lumps, which key the rest of the coating to the laths." 13 Amer. Encyc. (Ed. 1870) p. 377.

From Vodge's Architects' and Builders' Companion, p. 259, I find "plastering and stucco work," with rules for measuring it, and "lath" defined as "a slip of wood used in slating, tiling, and plastering." Page 139. And in the constitution, bill of prices, and rules for measuring of the "Memphis Plasterers" of 1872, I find: "For workmanship and material on lathing,"—"lathing only including nails;" and "for workmanship and material on brick-work."

The writers speak of the antiquity of the art, the perfection to which it had reached, the durable work done by the ancient mechanics, and the infinite variety and purposes to which plastering may be applied in architecture, etc.; and the statute of 1 Jac. *c.* 20, forbade the "plaisterers" to exercise the art of painting in Lon-

don. Chamb. Encyc.; 3 Toml. Law Dict. 115; 5 Jac. Law Dict. 158.

From these definitions, and our common understanding, it is evident that the words used are not technical terms of art requiring parol proof to explain them; and, while the word "plastering," like most of the words in our language, is susceptible of more than one meaning, as I have shown, when one undertakes, as these plaintiffs did, to do "the plastering and stucco work required by the plans and specifications for the said building," and "to furnish all labor, workmanship, and materials to do and complete the work hereinbefore set out, being the work defined and contemplated by said plans and specifications," etc., and "in a first-class, workman-like manner," and, in another place, "to do and furnish all labor, workmanship, and materials required to do the plastering and stucco work necessary in the erection and completion of said building," it can scarcely be doubted that, by these very terms of their written contract, they agreed to furnish whatever lathing was required or was necessary as a part of the "plastering work," and that it would be as much a part of the "materials" as the lime, sand, hair, or water would be, unless the walls were to be constructed to hold the "plastering" without laths. If the laths should not be included in the term "plastering," they certainly would be in the words "plastering work," for it is plain the contract is to be read as if the words were "plastering work" and "stucco work," particularly as there is in the "plans and specifications" no separate heading or title for the "stucco work," which is simply a part of the "plastering" as described by the specifications under the *subtitle*, not the general title by that name.

Laying aside, therefore, the "plans and specifications, and striking out of the contract all reference to them, and it is my opinion that the words, used in such a context, would import a stipulation to furnish the lathing, as a part of the "labor, workmanship, and materials" to do "the plastering and stucco work required in said cotton exchange building," or "necessary in the cotton exchange," or "necessary in the erection and completion of said building;" in all of which contexts the words "plastering" and "stucco work" are repeated. To do the work in a first-class and workman-like manner would require lathing, unless an inspection or description of the building should disclose to the plasterer that the walls were already lathed or otherwise prepared to hold the plastering. There is, in a legal sense, no such ambiguity as requires parol evidence to explain the words used, either "latent or patent" or "positive, relative, or mixed." *Barry* v. *Coombe*, 1 Pet. 640, 652; *Moran* v. *Prather*, 23 Wall. 492, 502; 2 Pars. Cont. (7th Ed.) 557, and note. We should look carefully to the substance of this agreement, as contradistinguished from its mere form, in order that we may give it a fair and just construction, and ascertain the substantial intent of the parties, which is the fundamental rule in the construction of all agreements. *Chesapeake & Ohio Canal Co.* v. *Hill*, 15 Wall. 94. And it may be said of the parol

proof in this case, in view of the language actually used, as was said in *Brawley* v. *U. S.*, 96 U. S. 168:

"All this is irrelevant matter. The written contract merged all previous negotiations, and is presumed, in law, to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimant's folly to have signed it. The court cannot be governed by any such outside considerations."

From the almost innumerable analogies to be found in the cases on this subject I select a few only to show the scope of the rule of construction as I have endeavored to apply it here. In *Shipman* v. *District of Columbia*, 18 Ct. Cl. 291, 332, a contract to construct "a wall" at five dollars per cubic yard was held to include excavations for the foundation. In *Stuart* v. *Cambridge*, 125 Mass. 102, the contract required excavations 14 inches, and "deeper if necessary to guaranty a firm and solid foundation," and it was held that the contractor must drive piles, if necessary, for "a firm and solid foundation." And in *Williams* v. *Fitzmaurice*, 3 Hurl. & N. 844, one contracted to do all the work specified under the heading "Carpenter and Joiner," and to complete the house by a given time, and to furnish the materials, etc. The "flooring" was not specified, and it was held to be included, for the common-sense reason that a house could not be completed without flooring. So, here, "plastering work" for the walls of a building would not be completed, "in a first-class and workman-like manner," without lathing; and where the plasterer agrees to furnish "all labor, workmanship, and materials to do and complete the plastering and stucco work," it is to be generally inferred that the necessary lathing to hold the plastering together is an essential part of the work, and, like the hair, which serves a similar purpose, and no other, in plastering, must be furnished as a part of the "materials" which go to make up a surface of plastering. One of the plaintiffs admits this construction when he testifies, as do other witnesses, that the common wood lath would be included in such a bargain, but not the *wire* lath mentioned in these specifications, which will be referred to hereafter.

But the plaintiffs' case would not be fairly treated were we to stop here, conclusive as these considerations have seemed to me, and inexorably as they demand a judgment for the defendant; for, if the plaintiffs' testimony be true, they have been cunningly overreached by the defendant, with a result that he who did the work has done it at a partial loss or insignificant gain, while he who furnished the "responsibility"—and he did not furnish the money, as argued, for that came from the cotton exchange—has reaped an enormous and unconscionable profit; or else both parties have made a mistake in understanding and dealing with each other, with precisely the same result, for that result is one of the fixed facts of this case. In either of which events, however, I may say now that their remedy is not by a suit upon this contract in writing, and a recovery upon another, which

they would prove by parol, in violation of wholesome rules of evidence, but by a bill to reform the contract and correct the mistake or set aside the fraud, if there has been one. But if the plaintiffs' testimony be not true, and that of the defendant established, then they have made a foolish and hard bargain, against which no court should give any relief, for they are not in any sense imbeciles.

The *Confederate Note Case*, 19 Wall. 548, 557, and others similar to it, show that the rule of ambiguity which lets in parol proof may be invoked by extrinsic circumstances, and as to terms which have as fixed a meaning as our word "dollars;" but they also show how extraordinary these circumstances must be. The plaintiffs' case does not, I think, fall within it, and the argument already suggested, for an adherence to the wise rule against parol testimony to vary written contracts, against a careless application of the exception growing out of "ambiguities," and in favor of a careful resort to the privilege of looking to the "surrounding circumstances," remains unshaken if we turn to the proof adduced in this case. Indeed, the conflict of oath against oath of interested witnesses, the destructive influence of the *ex post facto* developments, with their suggestive temptations to repair losses or retain unexpected profits, admonish a court to look well to the preservation of the general rule.

It must be remembered that proof that there was in fact a different contract does not bring the case within the exception; for, if so, there could be no general rule,—there would be no use in writing out contracts,—and every case would be a struggle over the whole ground of negotiation, agreement, and execution, in the light, not "of surrounding circumstances," but of those which subsequently develop themselves as well. *Maryland* v. *Railroad Co.*, 22 Wall. 105, 113.

What has been already said about the terms used to express the agreement gathers the strength of a conviction of absolute truth when we turn to the "plans and specifications," somewhat discorded there, and see that "lathing" is conspicuously provided for under the head of "Plastering." It can make no difference that it is *wire* lathing, in this matter of construing the contract, for there it appears before the contracting parties as a part and parcel of their written contract. It is a most important consideration for them in their bargainings with each other, for it is costly; but, in construing what they have written to express the agreement reached by the negotiations, the character and cost of the lathing are immaterial, unless we are to abrogate the rule of law for the interpretations of written instruments. The plaintiffs agree that they were to do the "deafening," which is another subheading under the general title "Plastering,"—no more conspicuous in the specifications than that of "Lathing," except that it immediately precedes it, and there can be no more reason for including one in the terms of contract as "plastering and stucco work" than the other. This could not be denied, and there would be no question about it but for the fact that in the specifications, under the same

general title of "Plastering," there is also a subheading of the same title, "Plastering," thus:

"PLASTERING."

"*Deafening*," (describing it.)
"*Lathing*," (describing it.)
"*Plastering*," (describing it.)

This method of division and subdivision is used all through the specifications as to all branches of the work, and everything is very plain and comprehensible. The plaintiffs undertake to prove that they were only to do the work under this *subtitle*, "Plastering," and the "deafening," and that the defendant was left to do the wire lathing. The defendant undertakes to prove that the plaintiffs were to do all that he was himself to do under the contract with Pierce & Morgan, which included all under the *general title* "Plastering;" and that especially was the wire lathing talked about and provided for in their negotiations. I shall not detail the proof, but it is sufficient to say that both parties struggle around this issue to prove every corroborating circumstance on either side, and to explain any fact that seems damaging to either party, with an ingenuity of swearing and argument that serves to demonstrate the value of the rule, and the necessity of adhering to the written words of the contract, in the light of the then existing facts, and not subsequent developments of actual results.

And it is wonderful how the peculiarities of this contract have deprived the court of many of the usual tests for resolving such a conflict of evidence. Take, for example, the rule of practical construction by the parties. Ordinarily the circumstance that Ford in fact contracted for the wire lathing, employed one Burke to put it on, etc.,—indeed, did exactly just what the Mellens say he was to do,—would be conclusive. But in the same way he made contracts for lime, sand, etc., though the Mellens swear this was an interference against which they protested at the time. On the other hand, the Mellens actually paid Burke for his work with the lathing out of money sent them by Ford, in compliance with the contract, just as he paid for lime, sand, labor, etc., but this, they say, was for Ford's convenience. The correspondence or other written evidence produced is equally inconclusive, and important letters and *memoranda* on either side are wanting, having been mislaid or lost. The plaintiffs swear that originally it was agreed or contemplated that they should do all the "plastering," including the lathing, at $7,200, an amount greater than that of this written contract,—sufficiently large to cover it,—but that that negotiation fell through because Pierce & Morgan would not release Ford, which was a condition between the Mellens and Ford. Ford agrees substantially to this, except that he gives other reasons also, and says the price was $6,200, and that for the very reason that Pierce & Morgan insisted on holding him to his responsibility to them he refused the proposed terms, and insisted on

the agreement which is contained in this writing we have before us.

The wire lathing actually cost about $1,600, as we now know, but at the time of the contract neither party knew what it would cost, and differed about it. Ford was to do all the work for $7,500, and the plaintiffs, according to defendant's contention, for $5,700, leaving Ford a profit of $1,800; whereas, if the plaintiffs' contention be true, and Ford pays for the lathing, the latter's profit would be only $200. That which he did was to pay for the work as it progressed, on the same terms as he was paid by Pierce & Morgan, and be "responsible" to them according to his contract. The work cost the Mellens, exclusive of the lathing, $4,425, not including the labor of themselves, worth $4 per day each. Deducting the $350 allowed for the abandonment of the deafening, and discarding all minor disputes as to proper statement of the account, by which it is sought to show, on the one hand, that the contract was in fact profitable, and, on the other, that the losses were greater, and we have, on the above basis, an actual profit for the Mellens of $925, from which, if we deduct the value of their own labor, it leaves them no profit worth mentioning; or, to put it another way, they got only $925 for their own labor and as profits on the contract, which was inadequate, they say. Make them pay for the lathing, and the Mellens lose $675 and their own labor, which, the argument is, they never would have contracted to do. Certainly not in the light of subsequent events, but possibly they did not know as much when they made the contract.

Ford seeks to prove, on the contrary, that the Mellens were unskillful and improvident in their management of details, and by their own folly paid more for the work than they should, and that they could have made money by proper management. He states the actual cost, including the lathing, at $4,972.28, leaving the Mellens a net profit of $276, exclusive of their labor.

We are asked, by the light of this kind of proof, to say which of them probably tells the truth as to the real agreement, and to construe the written words by the probabilities arising out of such evidence. But it is apparent that to do this would be to subvert the sound foundation of the rule which prohibits the resort to parol testimony to vary the plain terms of the written instrument, and to go beyond the "surrounding circumstances" at the time the contract was made. It is not to the circumstances existing at the time the work was finished, but those at the time it was commenced, to which we may look in construing the contract. We are not to go over the whole field, and say what these parties agreed to in fact, but only to say what is meant by the plain English words they have used to express for themselves their agreement. It is not the belief of either party as to what he was agreeing to which controls us, but the common understanding of the words used by both. *Bank* v. *Kennedy,* 17 Wall. 19, 28.

Returning, then, to the contract, I need not repeat the considerations which lead me to say that, by the plain terms of this instru-

ment, the plaintiffs agreed to do all the work under the general title of "Plastering," and not the special portion described under the subtitle "Plastering." If it be conceded that the use of the same word for both the *general* and the *subtitle* creates an "ambiguity," it is equally true "that, although the ambiguity is suggested on the face of the instrument, the face of the instrument also suggests the medium by which the ambiguity may be removed." *Barry v. Coombe, supra.* The considerations already mentioned sufficiently remove it in this case, but there are others, heretofore discarded, which make it more conclusive. We laid aside the "specifications" in construing the contract, because only in the specifications does the "ambiguity" appear, and sought to show what the parties must have meant by the language employed. But they are a part of the writing, and when inserted in it, and the then entire document is carefully observed, this supposed ambiguity at once disappears. And here, again, in favor of the plaintiffs, I lay aside the Pierce & Morgan contract, so fully recited in that of Ford and the Mellens, and take the latter only and the specifications. These specifications start out by saying, "Bids for the work will be received in the following manner," and then they subdivide the biddings into eight branches: the first being for "the entire works complete," others for "carpenters' work," "brick-work," etc., and No. 5 "plastering." Surely, with that before him, Mellen must have known that the word referred to the general and not the subtitle by that name. Again, under the "General Conditions" it is written that "the contractor is to  *  *  *  furnish all transportation, labor, materials, apparatus, scaffolding, and utensils needful," etc., "according to the specification." This invited any bidder, under the general head of "Plastering,"—and no bidding was offered under the subtitle,—to "lathing" as a part of the needful materials, labor, etc., for the "plastering."

Next, the specifications use the imperative mood in giving directions for the work, and each subject-matter is contained in separate paragraphs, and, when we come to the general title "Plastering," we find the contractor bidding for that—and no offer is made for bids of any other "plastering"—is directed under a subtitle to "deafen the first story," etc.; under another, "to lath all brick walls," etc.; and under another, "to plaster the walls," etc.; and, under this last subtitle, called "Plastering," language is used in describing the work which shows, I think, to any one who is a plasterer, or to any one who will only read the descriptions of plastering which I have cited from the books describing that trade, that it could not be done on this building without the *lathing* being done by the plasterer. The whole specification shows this; but especially is the bidder's attention directed to "put up stucco," etc.; "the pilasters," etc., "to be executed," etc.; "blackboards to be," etc.; and, finally, to "all *lathing and plastering,* to extend, in all cases, clear down to the floor, etc.

One cannot read the specifications as an entirety, and resist the

conclusion that any contract agreeing "to do the plastering and stucco work" according to them would include the wire lathing, unless it were especially excepted. We cannot write that exception in this contract, upon parol proof that it was intended to be so written. Nothing less than a bill to reform the contract could accomplish that. I concede the force of the argument that Mellen was not a bidder under these specifications, but only a subcontractor under him who did bid, and that, so contracting, he might undertake to do any portion of the work under the general head of "Plastering," and that he might have contracted to do only the subtitle; but that is not the question, for, if that was his agreement, he should have used apt language to express it, and our only function here and now is to say what is meant by the words "plastering and stucco work according to the plans and specifications."

If, however, we turn to Ford's contract with Pierce & Morgan, so fully recited in the Mellen contract, we find that Mellen agreed to do the work, not as an independent contractor at all, like Ford, but as one employed by Ford, and the language of his own contract is adapted to that circumstance, and is peculiar: "For and in consideration of one dollar cash in hand paid  *  *  *   the said party of the first part agrees to and with said second parties that he will allow and permit them to do the said plastering and stucco work in said Memphis Cotton Exchange, as set out in the first part of this instrument, on the following agreements and condition." Now, the "as set out," etc., refers to the recital almost *verbatim* of Ford's contract with Pierce & Morgan, and it is plain that the Mellens, by these words, agree to do all that by that contract Ford was to do, and it is agreed that Ford was bound to do the lathing as a part of the "plastering and stucco work." It is true, Ford's contract with Pierce & Morgan is no more definite than this with the Mellens, and points to the wire lathing no more distinctly; indeed, one is a parrot-like repetition of the other, and neither use the words of the specifications, for the words "plastering and stucco work" do not occur therein. Ford's contract gets them, no doubt, from a subdivision, so styled, in a builder's and contractor's manual already cited in this opinion, and in use in Louisville, Kentucky, as I am informed by the owner of the book.

It is ingeniously argued that Ford's agreement with Pierce & Morgan cannot define ambiguous terms for the Mellens; that we must interpret the identical words used in both contracts as Ford and the Mellens understood them, and not as Ford and Pierce & Morgan used them. This is so, no doubt; but it remains that Ford shows, by the Pierce & Morgan contract, how *he* understood them, and it is likely he used them in the same way in the Mellen contract; and, as to the Mellens, when they agreed, by identical description, to do all that Ford had agreed to do, the inference is that they agree to it as Ford understood it,—certainly, as he ought to have understood it. They may not have intended to do that,—may have been

overreached by Ford and his lawyer who drew the contract; but, I repeat, we have nothing to do with that,—we only interpret the words they used by the instrument they signed, and they cannot evade the force of these potential words by showing that the term "plastering" may have two meanings, both of which have been pointed out in this contract, and employed by the specifications. I' has been used in both ways here by the draughtsman of the specifications, but only in one by Ford and the Mellens in their contract. The fact that parties use the same word in a contract to express different meanings does not necessarily make the contract ambiguous.

Judgment for defendant.

### NOTE.

Parol Evidence to Explain a Written Instrument. An unambiguous contract cannot be interpreted by evidence as to the understanding of the parties. Brewster v. Potruff, (Mich.) 20 N. W. Rep. 823; Eggert v. White, (Iowa,) 13 N. W .Rep. 426; Johnson v. Cranage, (Mich.) 7 N. W. Rep. 188; Van Evera v. Davis, (Iowa,) 2 N. W. Rep. 509, 512; Donohoe v. Mariposa L. & M. Co., (Cal.) 5 Pac. Rep. 495.

Parol evidence is admissible to explain the meaning attached to expressions used, when their meaning is doubtful, Rhodes v. Cleveland R. M. Co., 17 Fed. Rep. 426; Jaqua v. Witham & A. Co., (Ind.) 7 N. E. Rep. 314: Barton v. Anderson, (Ind.) 4 N. E. Rep. 420; or to explain an interpolation, Jenkinson v. Monroe, (Mich.) 28 N. W. Rep. 663; Rush v. Carpenter, (Iowa,) 6 N. W. Rep. 172; to explain a description in a deed or will, or to identify the land described, Chambers v. Watson, (Iowa,) 14 N. W. Rep. 336; Crooks v. Whitford, (Mich.) 11 N. W. Rep. 159; Whitney v. Robertson, (Wis.) 10 N. W. Rep. 512; Messer v. Oestreich, Id. 6; Patch v. White, 6 Sup. Ct. Rep. 617; Thornell v. City of Brockton, (Mass.) 6 N. E. Rep. 74; Whitman v. Morey, (N. H.) 2 Atl. Rep. 899; Blair v. Bruns, (Colo.) 8 Pac. Rep. 569; Armijo v. New Mexico Town Co., (N. M.) 5 Pac. Rep. 709; or to show which of two persons of the same name is intended as the grantee in a deed, Begg v. Begg, (Wis.) 14 N. W. Rep. 602; or the beneficiary in a will, Webster v. Morris, (Wis.) 28 N. W. Rep. 353; but not to explain a patent ambiguity in a deed, Brandon v. Leddy, (Cal.) 7 Pac. Rep. 33.

See, also, Beason v. Kurz, (Wis.) 29 N. W. Rep. 230.