## BALDY *v.* HUNTER.

ERROR TO THE SUPREME COURT OF THE STATE OF GEORGIA.

No. 241. Argued April 29, 1898. — Decided May 31, 1898.

Transactions between persons actually residing within the territory dominated by the government of the Confederate States were not invalid for the reason only that they occurred under the sanction of the laws of that government or of any local government recognizing its authority.

Within such territory, the preservation of order, the maintenance of police regulations, the prosecution of crimes, the protection of property, the enforcement of contracts, the celebration of marriages, the settlement of estates, the transfer and descent of property, and similar or kindred subjects, were, during the war, under the control of the local governments constituting the so called Confederate States.

What occurred or was done in respect of such matters under the authority of the laws of these local *de facto* governments should not be disregarded or held invalid *merely* because those governments were organized in hostility to the Union established by the National Constitution; this, because the existence of war between the United States and the Confederate States did not relieve those who were within the insurrectionary lines from the necessity of civil obedience, nor destroy the bonds of society, nor do away with civil government or the regular administration of the laws, and because transactions in the ordinary course of civil society as organized within the enemy's territory, although they may have indirectly or remotely promoted the ends of the *de facto* or unlawful government organized to effect a dissolution of the Union, were without blame " except when proved to have been entered into *with actual intent* to further invasion or insurrection."

Judicial and legislative acts in the respective States composing the so called Confederate States should be respected by the courts if they were not " hostile *in their purpose* or mode of enforcement to the authority of the National Government, and did not impair the rights of citizens under the Constitution."

Applying these principles to the present case, the court is of opinion that the mere investment by Hunter, as guardian, of the Confederate funds or currency of his ward in bonds of the Confederate States should be deemed a transaction in the ordinary course of civil society, and not, necessarily, one conceived and completed with an actual intent thereby to aid in the destruction of the Government of the Union.

THE case is stated in the opinion.

*Mr. Pope Barrow* for plaintiff in error.   *Mr. S. R. Church* and *Mr. F. H. Stephens* were on his brief.

*Mr. P. W. Meldrine* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

William H. Baldy, a citizen of Georgia, died in that State prior to the civil war, leaving several children, one of whom was Marianne J. Baldy who became of full age on the 21st day of February, 1875.

In 1857 Dr. E. H. W. Hunter was appointed her guardian,

and after duly qualifying as such took possession of the estate of his ward.

By an act of the legislature of Georgia, passed on the 16th day of December, 1861, guardians, trustees, executors and administrators were authorized to invest any funds held by them in the bonds issued by the Confederate States, or in lands and negroes — an order to that effect being first obtained from a judge of the Superior Court, who was empowered to consider and pass such applications, either in term time or vacation. Georgia Laws, 1861, p. 32.

On the 25th day of April, 1863, the Superior Court of Jefferson County, Georgia, passed an order granting leave to the guardian of Miss Baldy to invest certain funds then in his hands in Confederate bonds. This order was granted upon the petition of the guardian, who expressed the opinion that such funds should be so invested. On the same day the investment was made.

The legislature of Georgia, by an act approved March 12, 1866, No. 124, entitled " An act for the relief of administrators, executors, guardians and trustees, and for other purposes," declared that all administrators, executors, guardians and trustees, who, in pursuance of an order, judgment or decree of any court having jurisdiction, or of any law of that State, *bona fide* invested the funds of the estate they represented in the bonds, notes or certificates of the State of Georgia or of the Confederate States, " be and they are hereby relieved from all the penalties of mismanagement, misappropriation or misapplication of the funds of the estates they represent, by reason of such investments ; " and that all administrators, executors, guardians and trustees, claiming the benefit of the provisions of that act, should, before their final settlement, make oath before the Ordinary of the county in which they had theretofore made their returns, " showing what funds of the estates they represent they have so invested, and shall also swear that the notes, bonds or certificates, so held by them, are the same kind of currency which they received for the estates they so represent." Laws Georgia, 1865–66, p. 85.

On the 2d day of July, 1866, the guardian made a return

to the proper court of his acts for the years 1864 and 1865, showing the amount in his hands, and also made oath before the Ordinary of Jefferson County, Georgia, " that in 1863, in pursuance of an order, judgment or decree of the Superior Court of said county as guardian of M. J. Baldy, a minor, he did *bona fide* invest twelve hundred dollars of the funds of said minor in the eight per cent bonds of the Confederate States, and that the bonds so held by him are the same kind of currency which he received for said minor's estate."

In 1876 Hunter received from the Ordinary of Jefferson County letters of dismissal as guardian of the several children of William H. Baldy. He died nine years thereafter, in 1885, and this suit was brought in 1893 against his executor in the name of Marianne J. Baldy by her next friend, she having become of unsound mind as far back at least as 1875, and being at the time this suit was brought in a lunatic asylum.

At the trial below the plaintiff asked the court to instruct the jury that " an investment by a guardian of money of his ward during the Confederate war, and while both guardian and ward were residing within the Confederate territory, in bonds of the Confederate States, was unlawful, and the guardian is responsible to the ward for the sum so invested ; " and that no act of the legislature of the State " passed during the late war, authorizing the guardian to invest the funds of his ward in Confederate bonds, and no order of any court of the State granted in pursuance of said act of the legislature, would authorize such investment." Both of these instructions were refused.

It is not contended that the case involves any question as to the statute of limitations.

It was agreed at the trial that the only matter in issue was as to the liability of Hunter's estate by reason of his having invested the ward's money in 1863 in bonds of the Confederate States. This appears from the charge to the jury in which the trial court, after observing that its duty was to follow the decisions of the Supreme Court of Georgia, said : " In the present case I am authorized to say that it is agreed between counsel that the investment was made *bona fide*, and

the only question is whether it was lawful or unlawful for the guardian to make this investment; and, further, that as I may decide the legal question, I shall instruct a verdict for plaintiff or defendant, as upon that would depend his right to have credit for that amount in his settlement with his ward. Following the decision of the Supreme Court of Georgia, I charge you that the investment by Dr. Hunter, the guardian, in Confederate bonds was a lawful investment. You are therefore instructed to find a verdict for the defendant." A verdict was accordingly returned for the defendant.

The verdict was made the judgment of the trial court, and that judgment was affirmed by the Supreme Court of Georgia. The latter court, after referring to some of its former decisions, held that "a guardian who, during the war between the States, in good faith invested the funds of his ward in bonds of the Confederate States, under an order of the judge of the Superior Court properly obtained under then existing laws, was protected thereby, and is not liable to the ward for the value of the money invested."

The case is now before this court on writ of error to the Supreme Court of Georgia.

The plaintiff in error contends that the principles to be deduced from our former decisions require the reversal of the judgment. As this proposition is disputed, it is necessary to examine the cases heretofore determined by this court.

Referring to the government established in 1862 in Texas in hostility to the United States, and which at that time was in the exercise of the ordinary functions of administration, this court in *Texas* v. *White*, 7 Wall. 700, 773, said: "It is not necessary to attempt any exact definitions within which the acts of such a state government must be treated as valid, or invalid. It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens, such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts, which would be valid if emanat-

ing from a lawful government, must be regarded in general as valid when proceeding from an actual, though unlawful, government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void."

In *Thorington* v. *Smith*, 8 Wall. 1, 7, 10–12, the question arose whether a contract for the payment of Confederate notes, which was made during the civil war between parties residing within the so called Confederate States, could be enforced in the courts of the United States. Upon that question, which was recognized as by no means free from difficulty, the court said: " It cannot be questioned that the Confederate notes were issued in furtherance of an unlawful attempt to overthrow the Government of the United States by insurrectionary force. Nor is it a doubtful principle of law that no contracts made in aid of such an attempt can be enforced through the courts of the country whose government is thus assailed. But, was the contract of the parties to this suit a contract of that character? Can it be fairly described as a contract in aid of the rebellion?" After referring to *United States* v. *Rice*, 4 Wheat. 246, 253, relating to the occupancy of Castine, Maine, in the war of 1812 by the British forces, and *Fleming* v. *Page*, 9 How. 603, 614, relating to the occupancy, during the Mexican war, of Tampico, Mexico, by the troops of the United States — they being described as " cases of temporary possession of territory by lawful and regular governments at war with the country of which the territory so possessed was part," and during which possession, the obligations of the inhabitants to their respective countries were held to have been suspended, although not abrogated — this court said : " The central government established for the insurgent States differed from the temporary governments at Castine and Tampico in the circumstance that its authority did not originate in lawful acts of regular war, but it was not, on that account, less actual or less supreme. And we think it must be classed among the governments of which these are examples. It is to be observed that the rights and obliga-

tions of a belligerent were conceded to it, in its military character, very soon after the war began, from motives of humanity and expediency by the United States. The whole territory controlled by it was thereafter held to be the enemies' territory, and the inhabitants of that territory were held, in most respects, for enemies. To the extent, then, of actual supremacy, however unlawfully gained, in all matters of government within its military lines, the power of the insurgent government cannot be questioned. That supremacy did not justify acts of hostility to the United States. How far it should excuse them must be left to the lawful government upon the reëstablishment of its authority. But it made obedience to its authority, in civil and local matters, not only a necessity, but a duty. Without such obedience civil order was impossible. It was by this government exercising its power throughout an immense territory, that the Confederate notes were issued early in the war, and these notes in a short time became almost exclusively the currency of the insurgent States. As contracts in themselves, except in the contingency of successful revolution, those notes were nullities; for, except in that event, there could be no payer. They bore, indeed, this character upon their face, for they were made payable only ' after the ratification of a treaty of peace between the Confederate States and the United States of America.' While the war lasted, however, they had a certain contingent value, and were used as money in nearly all the business transactions of many millions of people. They must be regarded therefore as a currency, imposed on the community by irresistible force. It seems to follow as a necessary consequence from this actual supremacy of the insurgent government, as a belligerent, within the territory where it circulated, and from the necessity of civil obedience on the part of all who remained in it, that this currency must be considered in courts of law in the same light as if it had been issued by a foreign government temporarily occupying a part of the territory of the United States. Contracts stipulating for payments in this currency cannot be regarded for that reason only as made in aid of the foreign invasion in the

one case, or of the domestic insurrection in the other. They have no necessary relations to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with *actual intent* to further invasion or insurrection. We cannot doubt that such contracts should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation."

In *Delmas* v. *Insurance Co.*, 14 Wall. 661, 665, upon writ of error to the Supreme Court of Louisiana, one of the questions presented was whether a judgment, which was otherwise conceded to be a valid prior lien for the party in whose favor it was rendered, was void because the consideration of the contract on which the judgment was rendered was Confederate money. This court said: "This court has decided, in the case of *Thorington* v. *Smith*, 8 Wall. 1, that a contract was not void because payable in Confederate money.; and notwithstanding the apparent division of opinion on this question in the case of *Hanauer* v. *Woodruff*, 10 Wall. 482, we are of opinion that on the general principle announced in *Thorington* v. *Smith*, the notes of the Confederacy actually circulating as money at the time the contract was made may constitute a valid consideration for such contract." So, in *Planters' Bank* v. *Union Bank*, 16 Wall. 483, 499, it was a question whether Confederate treasury notes had and received by the defendants for the use of the plaintiffs were a sufficient consideration for a promise, expressed or implied, to pay anything; and it was held upon the authority of *Thorington* v. *Smith*, above cited, that "a promise to pay in Confederate notes, in consideration of the receipt of such notes and of drafts payable by them, cannot be considered a *nudum pactum* or an illegal contract."

*Horn* v. *Lockhart*, 17 Wall. 570, 573, 575, 580, was a suit for an accounting as to funds in the hands of an executor, and to enforce the payment to legatees of their respective shares. One of the questions in the case was whether the defendant'

·was entitled to credit for a certain sum in Confederate notes which, in March, 1864, he had deposited "as executor in the Confederate States Depository Office, at Selma, Alabama, and received a certificate entitling him to Confederate States four per cent bonds to that amount." The receiving of money by the executor in Confederate notes, and the investment of such notes in Confederate bonds, were, it was said, in strict accordance with laws passed by the legislature of Alabama in November, 1861, and November, 1863, when that State was engaged in rebellion against the United States. The Circuit Court held that the executor could not exonerate himself from liability for the balance adjudged to be due the legatees by paying the same in Confederate bonds; that, as a general rule, all transactions, judgments and decrees which took place in conformity with existing laws in the Confederate States between the citizens thereof during the late war, "except such as were directly in aid of the rebellion, ought to stand good;" and that the exception of such transactions was a political necessity required by the dignity of the Government of the United States and by every principle of fidelity to the Constitution and laws of our common country. Upon these grounds it adjudged that the deposit by the executor of money of the estate in a depository of the Confederate States could not be sustained, as it was a direct contribution to the resources of the Confederate government. The decree, therefore, was that the executor should pay to plaintiff the sum so deposited by him in lawful money of the United States. Upon appeal the decree of the Circuit Court was affirmed, three of the members of this court dissenting. This court said: "We admit that the acts of the several States in their individual capacities, and of their different departments of government, executive, judicial and legislative, during the war, so far as they did not impair or tend to impair the supremacy of the national authority, or the just rights of citizens under the Constitution, are, in general, to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was

to be preserved, police regulations maintained, crime prose-
cuted, property protected, contracts enforced, marriages cele-
brated, estates settled, and the transfer and descent of property
regulated precisely as in time of peace.   No one that we are
aware of seriously questions the validity of judicial or legis-
lative acts in the insurrectionary States touching these and
kindred subjects, where they were not hostile *in their pur-
pose* or mode of enforcement to the authority of the National
Government, and did not impair the rights of citizens under
the Constitution.   The validity of the action of the probate
court of Alabama in the present case in the settlement of the
accounts of the executor we do not question, except so far as
it approves the investment of funds received by him in Con-
federate bonds, and directs payment to the legatees of their
distributive shares in those bonds.   Its action in this respect
was an absolute nullity, and can afford no protection to the
executor in the courts of the United States."

In the *Confederate Note case,* 19 Wall. 548, 555–557, in
which it was held that parol evidence was admissible to prove
that the word "dollars" in a contract made during the civil
war meant, in fact, Confederate notes, the court said : "The
treasury notes of the Confederate government were issued
early in the war, and, though never made a legal tender, they
soon, to a large extent, took the place of coin in the insurgent
States.   Within a short period they became the principal cur-
rency in which business in its multiplied forms was there trans-
acted.   The simplest purchase of food in the market, as well
as the largest dealings of merchants, were generally made in
this currency.   Contracts thus made, not designed to aid the
insurrectionary government, could not, therefore, without
manifest injustice to the parties, be treated as invalid between
them.   Hence, in *Thorington* v. *Smith* this court enforced a
contract payable in these notes, treating them as a currency
imposed upon the community by a government of irresistible
force.   As said in a later case, referring to this decision, ' It
would have been a cruel and oppressive judgment, if all the
transactions of the many millions of people composing the in-
habitants of the insurrectionary States, for the several years

of the war, had been held tainted with illegality because of the use of this forced currency, when those transactions were not made with reference to the insurrectionary government.' *Hanauer* v. *Woodruff*, 15 Wall. 448." Again: "When the war closed, these notes, of course, became at once valueless and ceased to be current, but contracts made upon their purchasable quality, and in which they were designated as dollars, existed in great numbers. It was at once evident that great injustice would in many cases be done to parties if the terms used were interpreted only by reference to the coinage of the United States or their legal tender notes, instead of the standard adopted by the parties. The legal standard and the conventional standard differed, and justice to the parties could only be done by allowing evidence of the sense in which they used the terms, and enforcing the contracts thus interpreted."

*Sprott* v. *United States*, 20 Wall. 459, 460, 462, was a suit against the Government in the Court of Claims under the Captured and Abandoned Property Act of March 12, 1863, c. 120, 12 Stat. 820, one of the provisions of which was that a claimant, before being entitled to recover the proceeds of the property, must prove that he had never given aid or comfort to the rebellion. It appeared that the cotton in question was sold to the claimant by an agent of the Confederate States as "cotton belonging to the Confederate States, and it was understood by the claimant at the time of the purchase to be the property of the rebel government, and was purchased as such." After observing that the cotton had been in the possession and under the control of the Confederate government, with claim of title, and that it was taken by the Union forces during the last days of the existence of that government, sold, and the proceeds deposited in the Treasury, this court said: " The claimant now asserts a right to this money on the ground that he was the owner of the cotton when it was so captured. This claim of right or ownership he must prove in the Court of Claims. He attempts to do so by showing that he purchased it of the Confederate government and paid them for it in money. In doing this he gave aid and assistance to the rebellion in the most efficient manner he possibly could.

He could not have aided that cause more acceptably if he had entered its service and become a blockade runner, or under the guise of a privateer had preyed upon the unoffending commerce of his country. It is asking too much of a court of law sitting under the authority of the Government then struggling for existence against a treason respectable only for the number and the force by which it was supported, to hold that one of its own citizens, owing and acknowledging to it allegiance, can by the proof of such a transaction establish a title to the property so obtained. The proposition that there is in many cases a public policy which forbids courts of justice to allow any validity to contracts because of their tendency to affect injuriously the highest public interests, and to undermine or destroy the safeguards of the social fabric, is too well settled to admit of dispute. That any person owing allegiance to an organized government, can make a contract by which, for the sake of gain, he contributes most substantially and knowingly to the vital necessities of a treasonable conspiracy against its existence, and then in a court of that Government base successfully his rights on such a transaction, is opposed to all that we have learned of the invalidity of immoral contracts. A clearer case of turpitude in the consideration of a contract can hardly be imagined unless treason be taken out of the catalogue of crimes." The court further said: "The recognition of the existence and the validity of the acts of the so called Confederate government, and that of the States which yielded a temporary support to that government, stand on very different grounds, and are governed by very different considerations. The latter, in most, if not in all, instances, merely transferred the existing state organizations to the support of a new and different national head. The same constitutions, the same laws for the protection of property and personal rights remained, and were administered by the same officers. These laws, necessary in their recognition and administration to the existence of organized society, were the same, with slight exceptions, whether the authorities of the State acknowledged allegiance to the true or the false Federal power. They were the fundamental principles for which civil society is organized

into government in all countries, and must be respected in their administration under whatever temporary dominant authority they may be exercised. It is only when in the use of these powers substantial aid and comfort was given or intended to be given to the rebellion, when the functions necessarily reposed in the State for the maintenance of civil society were perverted into the manifest and intentional aid of treason against the Government of the Union, that their acts are void."

From these cases it may be deduced —

That the transactions between persons actually residing within the territory dominated by the government of the Confederate States were not invalid for the reason only that they occurred under the sanction of the laws of that government or of any local government recognizing its authority;

That, within such territory, the preservation of order, the maintenance of police regulations, the prosecution of crimes, the protection of property, the enforcement of contracts, the celebration of marriages, the settlement of estates, the transfer and descent of property, and similar or kindred subjects, were, during the war, under the control of the local governments constituting the so called Confederate States;

That what occurred or was done in respect of such matters under the authority of the laws of these local *de facto* governments should not be disregarded or held to be invalid *merely* because those governments were organized in hostility to the Union established by the national Constitution; this, because the existence of war between the United States and the Confederate States did not relieve those who were within the insurrectionary lines from the necessity of civil obedience, nor destroy the bonds of society, nor do away with civil government or the regular administration of the laws, and because transactions in the ordinary course of civil society as organized within the enemy's territory, although they may have indirectly or remotely promoted the ends of the *de facto* or unlawful government organized to effect a dissolution of the Union, were without blame " except when proved to have been entered into *with actual intent* to further invasion or insurrection ; " and,

That judicial and legislative acts in the respective States composing the so called Confederate States should be respected by the courts if they were not " hostile *in their purpose* or mode of enforcement to the authority of the National Government, and did not impair the rights of citizens under the Constitution."

Applying these principles to the case before us, we are of opinion that the mere investment by Hunter, as guardian, of the Confederate funds or currency of his ward in bonds of the Confederate States should be deemed a transaction in the ordinary course of civil society, and not, necessarily, one conceived and completed with an actual intent thereby to aid in the destruction of the Government of the Union. If contracts between parties resident within the lines of the insurrectionary States, stipulating for payment in Confederate notes issued in furtherance of the scheme to overturn the authority of the United States within the territory dominated by the Confederate States, were not to be regarded, for that reason only, as invalid, it is difficult to perceive why a different principle should be applied to the investment by a guardian of his ward's Confederate notes or currency in Confederate bonds — both guardian and ward residing at that time, as they did from the commencement of the civil war, within the Confederate lines and under subjection to the Confederate States.

As to the question of the intent with which this investment was made, all doubt is removed by the agreement of the parties at the trial that the investment was *bona fide,* and that the only question made was as to its legality. We interpret this agreement as meaning that the guardian had in view only the best financial interests of the ward in the situation in which both were placed, and that he was not moved to make the investment with the purpose in that way to obstruct the United States in its efforts to suppress armed rebellion. We are unwilling to hold that the mere investment in Confederate States bonds — no actual intent to impair the rights of the United States appearing — was illegal as between the guardian and ward.

It is said, however, that any such conclusion is inconsistent with the decision in *Lamar* v. *Micou*, 112 U. S. 452, 476. That was a suit in the Circuit Court of the United States for the Southern District of New York, having been removed thereto from the Supreme Court of that State. One of the questions arising in that case was as to the liability of a guardian for moneys belonging to his wards which were invested by him during the civil war in bonds of the Confederate States. This court said: "Other moneys of the wards in Lamar's hands, arising either from dividends which he had received on their behalf or from interest with which he charged himself upon sums not invested, were used in the purchase of bonds of the Confederate States, and of the State of Alabama. The investment in bonds of the Confederate States was clearly unlawful, and no legislative act or judicial decree or decision of any State could justify it. The so called Confederate government was in no sense a lawful government, but was a mere government of force, having its origin and foundation in rebellion against the United States. The notes and bonds issued in its name and for its support had no legal value as money or property, except by agreement or acceptance of parties 'capable of contracting with each other, and can never be regarded by a court sitting under the authority of the United States as securities in which trust funds might be lawfully invested. *Thorington* v. *Smith*, 8 Wall. 1; *Head* v. *Starke*, Chase, 312; *Horn* v. *Lockhart*, 17 Wall. 570; *Confederate Note case*, 19 Wall. 548; *Sprott* v. *United States*, 20 Wall. 459; *Fretz* v. *Stover*, 22 Wall. 198; *Alexander* v. *Bryan*, 110 U. S. 414. An infant has no capacity by contract with his guardian, or by assent to his unlawful acts to affect his own rights. The case is governed in this particular by the decision in *Horn* v. *Lockhart*, in which it was held that an executor was not discharged from his liability to legatees by having invested funds, pursuant to a statute of the State, and with the approval of the probate court by which he had been appointed, in bonds of the Confederate States, which became worthless in his hands."

It was, of course, intended that this language of the court

be taken in connection with the history of the guardian's transactions as disclosed in the full and careful statement of the case that preceded the opinion. It appears from that statement that the guardian was appointed prior to the war by the Surrogate of Richmond County, New York, in which State he, at that time, 1855, resided; that immediately upon his appointment he received, in New York, several thousand dollars belonging to each of his wards, and invested part of it in 1856 in the stock of a New York bank and a part in 1857 in the stock of a Georgia bank, each bank then paying good annual dividends; that in 1861 he had a temporary residence in New York; that upon the breaking out of the rebellion he removed all his property and voluntarily left New York, passing through the lines to Savannah where he took up his residence, sympathizing with the rebellion and doing all that was in his power to accomplish its success, until January, 1865; and that he took up his residence again in New York in 1872 or 1873, after which time he lived in that city. It further appeared that of the money of his wards accruing from bank stocks he, in 1862, invested $7000 in bonds of the Confederate States and of the State of Alabama, and afterwards sold the Alabama bonds and invested the proceeds in Confederate States bonds. It thus appears that *Lamar v. Micou* was a case in which the guardian, becoming such under the laws of New York, in violation of his duty to the country, and after the war became flagrant, voluntarily went into the Confederate lines, and there gave aid and comfort to the rebellion; and yet he asked that the investment of his wards' money in Confederate States bonds receive the sanction of the courts sitting in the State under the authority of whose laws he became and acted as guardian.

Besides, it is distinctly stated in the opinion in that case that the sums which Lamar used in the purchase of bonds of the Confederate States were moneys of the wards in his hands " arising either from dividends which he had received in their behalf, or from interest with which he charged himself upon sums not invested," 112 U. S. 476, which is a very different thing from reinvesting (as in the present case) in

Confederate currency moneys previously received in the like kind of currency. The present case is governed by considerations that do not apply to that case. We do not doubt the correctness of the decision in *Lamar* v. *Micou*, upon its facts as set out in the report of that case; but we hold, in the present case, for the reasons we have stated, that the judgment of the Supreme Court of Georgia must be

*Affirmed.*