PRUITT *v.* SEBASTIAN COUNTY COAL & MINING CO.

4-8773                                          222 S. W. 2d 50

Opinion delivered July 4, 1949.

*Bates, Poe & Bates,* for appellant.

*Pryor, Pryor, Dobbs & Barham,* for appellee.

ED. F. McFADDIN, Justice. In what was commenced as a simple suit to enjoin a trespass on land and to recover damages, there has been injected the question of the correct boundary line between Scott and Sebastian Counties; and this boundary line question, like Banquo's ghost, "will not down." It turns up at every angle of this litigation.

The appellee, Sebastian County Coal & Mining Company, filed suit in the Sebastian Chancery Court claiming ownership of the following lands alleged to be in Sebastian County, Arkansas, to-wit: "The NW¼ NW¼ Sec. 5, Twp. 3 N., R. 32 W.; and NE¼ NE¼, Sec. 6, Twp. 3 N., R. 32 W.; and the Frl. N½ Sec. 1, Twp. 3 N., R. 33 W."

The complaint alleged that the defendant John Pruitt (appellant here) had trespassed on the lands and had cut and removed timber therefrom. The prayer was for injunction and damages. The defendant Pruitt admitted that he had cut and removed the timber from the lands, but claimed by proper pleadings (1) that the lands were in Scott County and therefore the Sebastian Chancery Court was without jurisdiction; and also (2) that he held under a tax title (based on a Scott County forfeiture) which he claimed to be superior to the plaintiff's claim of title.

This was a local action under § 1386, Pope's Digest, which requires such an action to be prosecuted in the county in which the land is situated.[1] Even if they had desired—which they did not—the parties could not by consent have conferred jurisdiction of the subject matter in this case.[2]; so the jurisdictional and sharply contested issue was whether the lands were in Scott or Sebastian County. The Chancery Court held that they were in Sebastian County, and awarded plaintiff the injunction and damages. The defendant has appealed.

---

[1] See Drainage Dist. v. Hutchins, 184 Ark. 521, 42 S.W. 2d 996.

[2] Mo. Pac. R. Co. v. Henry, 188 Ark. 530, 66 S.W. 2d 636.

We find that this Court on previous occasions has decided county boundary line issues in suits between individuals. Bittle v. Stuart [3] was a suit between private litigants (as distinguished from a *quo warranto* proceeding or an action between disputing counties); and this Court, in an opinion by Mr. Justice EAKIN, determined the validity of a legislative enactment concerning the boundaries and the territory embraced in Clark County. Reynolds v. Holland [4] was a suit between private litigants; and this Court—again speaking by Mr. Justice EAKIN—determined the location of the boundary line between counties. Crawford v. Brown [5] was a private action to recover land alleged to be in Clark County. The defense was that the land was in Hot Spring County; and this Court, by Mr. Justice RIDDICK, in deciding the issues, necessarily determined a disputed county boundary question. In Crow v. Roane [6] this Court, speaking by Mr. Justice McCULLOCH, settled the boundary line between Miller and Little River Counties, in litigation between individuals. Until the Legislature provides that an adjudication of county boundary lines be determined only in a proceeding in which the interested counties be parties, or in which the State act by *quo warranto,* the cases heretofore cited are precedent and authority for a county boundary line dispute to be indirectly adjudicated in a suit between individuals. [7]

Each side has presented the case with skill and care. Along with the oral testimony, 50 exhibits were introduced, including more than 20 maps. Before we proceed to consider the question here presented—that is, the boundary line between Scott and Sebastian Counties in ranges 31, 32 and 33 west—we state facts necessary to present the contentions.

---

[3] 34 Ark. 224.

[4] 35 Ark. 56.

[5] 74 Ark. 568, 86 S.W. 425.

[6] 86 Ark. 172, 110 S.W. 801.

[7] Sections 17-103 to 17-108 (inclusive) Ark. Stats. of 1947, and also sections 2380 to 2385 (inclusive) of Pope's Digest come to us from Chapter 37, secs. 1 to 6 (inclusive) of the Revised Statutes of 1837, and provide how counties may have boundary lines surveyed; but these provisions have not prevented the adjudication of county boundaries in private litigation, such as is the case at bar.

■ Scott County was created from parts of Crawford and Polk Counties by Act of the Arkansas Territorial Legislature of November 5, 1833;[8] and that Act fixed—insofar as is here involved—the north boundary of Scott County to be "the line between Townships 3 and 4 North of the Base Line." In other words, north of Scott County was Crawford County, and the north boundary line of Scott County in Ranges 31, 32 and 33 was the north line of Township Three. The Arkansas Territorial Legislature on October 24, 1835 [9] adopted an Act enlarging the boundaries of Scott County; and the General Assembly of the State of Arkansas on December 16, 1838 [10] adopted an Act more particularly defining the line between the Counties of Scott and Crawford. The north line of Scott County, insofar as is here involved, remained as established by these three Acts (November 5, 1833; October 24, 1835 and December 16, 1838) until the creation of Sebastian County.

■ Sebastian County was created from parts of Crawford, Polk and Scott Counties by the Act of the General Assembly of January 6, 1851.[11] That Act took a strip of land off of the west side of Scott County about 13 miles east and west, and about 18 miles north and south; and all of such territory so taken in Ranges 31, 32 and 33 was *south* of the north line of Township Three. The taking of this territory from Scott County by the Act of 1851 is claimed by the appellant to have been unconstitutional; and this will be discussed in topic I.

■ The ordinance of June 1, 1861, of the Arkansas Secession Convention returned to Scott County all of Sebastian County that was *south of the Poteau Mountain*. Appellee claims that this ordinance definitely established the boundary line between Scott and Sebastian Counties to be the top of the Poteau Mountain; but the appellant claims that the description in this 1861 or-

[8] See p. 98 of Acts of the General Assembly of the Territory of Arkansas of 1833.

[9] See page 16 of the Acts of the Arkansas Territory of 1835.

[10] See p. 81 of the Acts of the General Assembly of the State of Arkansas of 1838.

[11] See page 81 of the Acts of the General Assembly of the State of Arkansas of 1851.

dinance was too indefinite to be valid. Discussion of this ordinance is contained in topic II.

■ The aforementioned Acts of 1851 and 1861 are apparently the only legislative enactments which attempted to fix the boundary between Scott and Sebastian Counties; but the appellant lists a number of subsequent Acts which he claims constitute recognition of the questioned boundary line to be the north line of Township Three. These various Acts cited by the appellant, as well as his other contentions will be discussed in topics III and IV.

What we are really required to decide is whether the lands described in the complaint in this case are in Sebastian County; but to decide that question we must necessarily decide the larger question as to the boundary line between Scott and Sebastian Counties in Ranges 31, 32 and 33 West. The territory drawn into dispute in this case is all of the land (approximately 3800 acres) that lies south of the north line of Township Three and north of the center ridge line of the Poteau Mountain. Roughly, it is a triangular area beginning on the Arkansas-Oklahoma boundary line, and being approximately two miles wide north and south, and extending easterly and north of the top of the Poteau Mountain range to the point where that mountain range crosses the north line of Township Three. A diagram showing the area is attached to this opinion. It is appellant's contention that the Scott County line extends due east and west along the north line of Township Three, just as stated in the Act of 1833 creating Scott County. It is the appellee's contention that the Scott County line extends along the high point of the Poteau Mountain range, as stated in the Act of 1861. With the contentions thus stated, we now consider the topics as previously indicated.

I. *The Act of 1851 Creating Sebastian County.* Art. IV, § 29 of the Constitution of 1836 (in force in 1851) provided: "No County now established by law shall ever be reduced by the establishment of any new county or counties to less than 900 square miles, . . ."

Appellant says that by the Act of 1851—creating Sebastian County—territory was taken from Scott County to such a great extent that what remained was in fact less than 900 square miles. Here is appellant's language on this point:

"Appellant relies on the fact that the Act of 1851, creating Sebastian County, was unconstitutional and, therefore, a nullity, to that part which proposed to take a part of Scott County, a county established at the adoption of the Constitution of 1836, and add the same to Sebastian County, a new county; because, in doing so, the Act would reduce the area of Scott County below the constitutional limit of 900 square miles. Therefore, the boundary line, with reference to Sections 5 and 6 of Township 3 North, Range 32 West, and Section 1 in Township 3 North, Range 33 West, would be the township line between Townships 3 and 4 North as established in the Act of 1833, originally establishing Scott County."

A determination of how many square miles of territory were left in Scott County *after* the creation of Sebastian County, necessitates a study of the Act of November 5, 1833 (creating Scott County), with the territorial changes made by the Acts of October 24, 1835; December 16, 1838; December 5, 1840; January 2, 1845, and January 6, 1851. Judicially, we know the county boundaries;[12] and it is our conclusion that there remained in Scott County after the creation of Sebastian County in 1851, an area in excess of 972 square miles. This is true, because the Act of October 24, 1835 [13] had enlarged Scott County. This Act was not discussed in any of the briefs on this case. The territory given Scott County by the said Act of October 24, 1835, remained a part of Scott County until Sarber County (now Logan County) was organized by the Act of the General Assembly of March 22, 1871.[14] So, on the fact question, it appears that Scott

---

[12] Crow v. Roane, 86 Ark. 172, 110 S.W. 801; Cox v. State, 68 Ark. 462, 60 S.W. 27.

[13] See p. 16 of the Acts of the Arkansas Territorial Legislature of 1835.

[14] See Act 25 of the General Assembly of Arkansas of 1871.

County did have more than 900 square miles of territory remaining after the Act of January 6, 1851, had created Sebastian County; and therefore Scott County is in no position to complain about the unconstitutionality of the said Act.

But, even assuming—for the purposes of further answer to appellant's argument—that Scott County did in fact have less than 900 square miles of territory remaining after the creation of Sebastian County by the Act of January 6, 1851, nevertheless, the diminution of territory of Scott County to less than 900 square miles did not appear on the face of the Act of January 6, 1851,[15] and that Act was allowed to go into effect. So far as the record here discloses, and so far as our additional research has revealed, this is the first litigation challenging the validity of the Act of 1851. Sebastian County began to function as a county in 1851, and has so continued ever since.

The provision of Art. IV, § 29 of the Constitution of 1836—concerning a minimum of 900 square miles for a county, as previously copied—was changed by subsequent Constitutions,[16] so that in the Constitution of 1874 (present one) the provision makes the minimum 600 instead of 900 square miles. Furthermore, the Constitution of 1874 recognized in several places the existence of Sebastian County;[17] and schedule I to the Constitution of 1874 says:

"All laws now in force which are not in conflict or inconsistent with this Constitution shall continue in force

[15] See Greene County v. Clay County, 135 Ark. 301, 205 S.W. 709, in which this Court refused to hold void an enactment because the Act did not disclose on its face that less than 600 square miles remained.

[16] The Constitution of 1861, Art. IV, § 28 said: "No county now established by law shall ever be reduced by the establishment of any new county or counties to less than 625 square miles . . ." The Constitution of 1864, Art. IV, § 27 said: "No county now established by law shall ever be reduced, by the establishment of any new county or counties, to less than 600 square miles . . . ." The Constitution of 1868, by Art. XV, § 12, used the same figure of 600 square miles, as does also the present Constitution of 1874, by Art. XIII, § 1.

[17] Art. XIII, § 5 allowed Sebastian County to have two districts.
Art. XVIII named Sebastian County.
Art. VIII, § 1 provided that Sebastian County should have a representative.

until amended or repealed by the General Assembly, . . ."

The Act of 1851 (as modified by the Act of 1861 subsequently to be mentioned) was in force at the time of the adoption of the Constitution of 1874 and was not inconsistent with that Constitution.

Again assuming that the Act of 1851 originally had been susceptible of being defeated by Scott County under the provisions of the Constitution of 1836, nevertheless, our Court files do not disclose that any such effort was ever made. We find no adjudication of unconstitutionality of the Act of 1851 at the time that the Act might have been held to be unconstitutional. Instead, the constitutional minimum was itself reduced, and Scott County will have more than 600 square miles of territory, even after the result of the present litigation is announced.

The actual existence of the Act of 1851 is an operative fact, and has had consequences which cannot be justly ignored.[18] The past cannot be erased now by a judicial declaration at this late hour; so we hold that the question of the constitutionality of the Act of 1851 comes at least 65 years too late, since the Constitution of 1874 cured the then unchallenged defect in the Act of 1851.

II. *The Act of 1861.* After the Act of 1851 creating Sebastian County, the next legislation affecting the boundary line between Scott and Sebastian Counties was the ordinance of June 1, 1861, of the Arkansas Secession Convention. The historical background of this Act is necessary in considering its legality. On January 15, 1861, the General Assembly of Arkansas adopted an Act directing the Governor of the State to call a General Election to be held on February 18, 1861, so that the People of the State could vote for or against a secession convention, and could select delegates from each county. The election was called, and resulted in an affirmative vote for such convention, and the naming of delegates. Accordingly, the Arkansas Secession Convention met at

[18] This language is paraphrased from that of Chief Justice HUGHES, found in the case of Chicot County Drainage District v. Baxter St. Bk., 308 U.S. 371, 84 Law Ed. 329.

the State Capitol on March 4, 1861; adopted a resolution of secession; and drafted the Constitution of 1861. Also, the same convention at a later date passed a number of laws—each called an "Ordinance"—dealing with matters entirely domestic and not concerned in any wise with the waging of the war for secession. Among other such domestic ordinances, there was the one of June 1, 1861,[19] concerning the boundary between Scott and Sebastian Counties, section 1 of which reads:

"That all that part of Sebastian County lying south of the Poteau Mountain, and taken from the County of Scott for the purpose of creating the County of Sebastian, be, and is, hereby attached to and made a part of the County of Scott."

Neither party to this present litigation has raised any question about the legality *per se* of this ordinance of the Arkansas Secession Convention of 1861; but we point out that in the case of Baldy v. Hunter,[20] Mr. Justice HARLAN, speaking for the Supreme Court of the United States, said:

". . . judicial and legislative acts in the respective states composing the so-called Confederate States should be respected by the courts if they were not 'hostile *in their purpose* or mode of enforcement to the authority of the national government, and did not impair the rights of citizens under the Constitution.'"

That opinion discussed in a scholarly manner the validity of the Acts of the Legislatures and of the judgments of the Courts in the various Confederate States during the War Between the States; and under the holding in Baldy v. Hunter, *supra,* the said Act of the Arkansas Secession Convention of 1861 concerning Scott and Sebastian Counties is not void as an act against the United States of America. We therefore consider the Act as valid in that respect.

Appellee claims that the effect of the ordinance of June 1, 1861, was to make the top of the Poteau Mountain

---

[19] See page 70 of the Ordinance of the State Convention of 1861.
[20] 171 U.S. 388, 43 Law Ed. 208, 18 S. Ct. 890.

Range the dividing line between the two counties. Appellant claims that the quoted language in the said ordinance is too indefinite to be valid. In *Crawford* v. *Brown*[21] and in *Crow* v. *Roane*[22] we had cases in which the Legislature had made a river to be the common boundary line between two counties; and we held in each case that the language was sufficiently definite to constitute a boundary line. Here, the territory going to Scott County is described as "lying south of the Poteau Mountain"; and because of the facts now to be discussed, we hold this to be a definite description.

The evidence in this case shows that the Poteau Mountain has only one range that enters Arkansas from Oklahoma, and that such range extends several miles to the east, and finally crosses the north line of Township Three in Section 3, Township 3 N., Range 31 West. There are hillocks and isolated peaks to the north of the main range, but there is only one main range of the Poteau Mountain in the affected area; so the description "lying south of the Poteau Mountain," as used in the 1861 ordinance, has definite reference to the main range. In John Bassett Moore's International Law Digest, vol. I, p. 616, the rule as to boundaries is succinctly stated by that eminent jurist: "Where a boundary follows mountains or hills, the water divide constitutes the frontier." In C. C. Hyde's work on International Law, vol. I, p. 242, the rule is stated: "A range of mountains or hills may be the boundary between two states. In such case the line of demarcation follows the water shed."[23]

In the case of *Belding* v. *Hebard*, 103 Fed. 532, it was recognized that the crest of the great mountain ranges extending across the State in a southwesterly direction is the boundary line between Tennessee and North Carolina.

In the case at bar the Act (Ordinance) of 1861 separating Scott and Sebastian Counties did not say "South of the foot of the Poteau Mountain," but said "South of

[21] 74 Ark. 568, 86 S.W. 425.

[22] 86 Ark. 172, 110 S.W. 801.

[23] To the same effect, see Hall on International Law, 6th Ed., p. 123; Glenn on International Law, p. 56.

the Poteau Mountain," so we hold that this Act of 1861 is valid, and fixed the water divide of the Poteau Mountain Range as the common boundary line between Scott and Sebastian Counties in ranges 31, 32 and 33 west, since there was territory in these survey ranges (31, 32 and 33 west) that had been taken from Scott County in 1851 to form a part of Sebastian County.

III. *Subsequent Legislation.* Appellant insists that the General Assembly of Arkansas has, by legislation since 1861, repeatedly recognized the North Line of Township Three as the boundary line between Scott and Sebastian Counties. There are six such legislative enactments cited by appellant. We identify and give the caption of each:

(1) Act 213 of 1907, "An Act Organizing Certain Territory in Sebastian County into a Special School District to be Known as the West Hartford Special School District."

(2) Act 463 of 1911, "An Act to Create a Special School District at Bates, in Scott County, and to Authorize it to Borrow Money, and for Other Purposes."

(3) Act 113 of 1915, "An Act Adding Certain Territory to the Bates Special School District, and for Other Purposes."

(4) Act 346 of 1919, "An Act to Cure Alleged Defects in the Organization of the Bates Special School District and the Issuance of Bonds by the Bates and Gipson Special School District of Scott County, Arkansas, and for Other Purposes."

(5) Act 670 of 1919 (found on p. 2586 of Vol. II of the Road Acts of 1919), "An Act to Create the Poteau Valley Road Improvement District, of Scott County, Arkansas."

(6) Act 371 of 1923, "An Act Creating the Referendum Road District of Sebastian County, Arkansas."

While the title of an act is not controlling, nevertheless, as Mr. Justice EAKIN said in *Reynolds* v. *Holland,* 35 Ark. 56:

"The title of the act affords the clue to its intention."

It will be observed that each of these six acts deals with some special matter, and did not profess an intention to effect a change in the boundary line between Sebastian and Scott Counties. Any change of boundary line by any or all of these acts can be claimed only by urging that such latter act or acts by implication amended the 1861 act,[24] which had fixed the boundary between the counties. Previous statutes may be amended by implication[25] necessarily resulting from subsequent legislation; but such implied amendments are not favored.

In 59 C. J. 857, in speaking of implied amendments to statutes, this language appears:

"It has been very generally stated that amendments of statutes by implication are not favored and will not be upheld in doubtful cases. Ordinarily, the legislature's enactment of a law will not be held to have changed a statute that it did not have under consideration at the time of enacting such law; and implied amendments cannot arise merely out of supposed legislative intent in no way expressed, however necessary or proper it may seem to be. An amendment by implication can occur only where the terms of a later statute are so repugnant to an earlier statute that they cannot stand together."

In Sutherland on Statutory Construction (3rd Ed.), § 1913, the holdings are summarized in this language:

"Amendments by implication, like repeals by implication, are not favored and will not be upheld in doubtful cases. The legislature will not be held to have changed a law it did not have under consideration while enacting a later law, unless the terms of the subsequent

[24] Act (Ordinance) of June 1, 1861 may be found on p. 70 of the Ordinances of the State Convention of Arkansas of 1861.

[25] See McLeod, Comm'r., v. Commercial Natl. Bank, 206 Ark. 1086, 178 S.W. 2d 496; Little Rock v. Quindley, 61 Ark. 622, 33 S.W. 1053; Pace v. State, 189 Ark. 1104, 76 S. W. 2d 294; City of Little Rock v. Black Motor Lines, 208 Ark. 498, 186 S.W. 2d 665.

act are so inconsistent with the provisions of the prior law that they cannot stand together.''[26]

There is nothing in either Act 213 of 1907, Act 463 of 1911 or Act 371 of 1923 to support Appellant's contention that any or all of these acts by implication could have been intended to effect a change of boundaries between the counties here involved.

It is true that in Act 113 of 1915, in Act 346 of 1919 and in Act 670 of 1919 there is mention of certain land sections as being ''in twp. 3 N., R. 32 W. in Scott County, Arkansas.'' Some of the said land sections were in fact in the strip of land here in dispute, and are in Sebastian County by virtue of the Act (Ordinance) of June, 1861, *supra*. Appellant insists that the effect of each and all of these three Acts ( i. e., the one of 1915 and the two of 1919, just mentioned) is to recognize these land sections as being in Scott County. We hold that it was not the purpose of any of these said Acts to change the county boundaries, but to change boundaries of special districts. The land sections were definitely described without reference to any county. In *Rogers* v. *Magnolia Oil and Gas Co.*[27] we held that a description was sufficiently definite which made no reference to any county, but described the lands by section, township and range in accordance with the public survey. So in the Acts here in question, the description of the lands by section, township and range shows the location of the lands, and the mention of the county is surplusage.

Applying the rule against implied amendments, as previously stated, we hold that it was not the purpose of the Legislature, in enacting any or all of these six special Acts, to change the boundary between Scott and Sebastian Counties, as fixed by the Act of 1861. The very nature of these special Acts forbids a holding that the Legislature intended to amend the prior law of 1861

[26] For recent cases following the above, see Hogg v. Caudill, 254 Ky. 409, 71 S.W. 2d 1020; Genereaux v. Petit (Wash.), 19 Pac. 2d 911; Belknap v. Schock (West Va.), 24 S.W. 2d 457; and Harding v. Mutual Benefit Assn., (Idaho), 39 Pac. 2d 306.

[27] 156 Ark. 103, 245 S.W. 802.

fixing the boundaries between Scott and Sebastian Counties.

IV. *Appellant's Contention that the Claimed Boundary was Established by Recognition and Acquiescence.* Finally, appellant insists that Sebastian and Scott Counties and the citizens of each, as well as the public generally, have all the time recognized this disputed territory as being in Scott County; and that such recognition and acquiescence should control in this case. But we hold that this argument is based on a theory of limitations against the Sovereign, which theory has never been recognized in this State. In *Bittle* v. *Stuart,* 34 Ark. 224, Mr. Justice EAKIN said:

"Where no constitutional inhibitions exist, the counties are under the control of the sovereign power, which may, at pleasure, alter their boundaries, change their names, burden them with obligations, or even, it is said, abolish any particular one or more; furnishing, however, another county organization for all parts of the territory."

Likewise, in *Reynolds* v. *Holland,* 35 Ark. 56, the same eminent jurist said: "The power to change county lines is inherent in the legislature, subject to express constitutional restrictions, and the essential requisites of the state which are implied in our frame of government. See case of *Eagle, et al.* v. *Beard,* 33 Ark. 497."

The fact that the Legislature alone has the power to change county boundaries was clearly held by this Court in the case of *Cox* v. *State,* 68 Ark. 462, 60 S. W. 27,[28] in which case there arose a question as to the boundary line between Lafayette and Miller Counties. A witness testified that the south bank of Red River was "considered the boundary line" between the counties. This Court held that the boundary line was fixed by the Act of the Legislature—it was the center of the river—and could not be altered by public understanding.

---

[28] Even though the holding as to venue in that case was changed in the subsequent case of Bottom v. State, 155 Ark. 113, 244 S.W. 334, so that the crime could be prosecuted in either county, nevertheless, the statement of the Court, as to the Legislature having sole authority to change boundary lines, remains unchallenged.

To support his argument on this point of recognition and acquiescence, appellant cites a line of cases, such as *Puget Sound National Bank* v. *Fisher* (Wash.), 100 Pac. 724, and *Russell* v. *Robinson* (Ala.) 44 So. 1040, in each of which cases the actual county boundaries were indefinitely delineated in the legislative acts, and the Court allowed evidence of acquiescence in order to clarify the uncertainty in the land survey. But even these cases cited by appellant recognize that the sole power to fix county boundaries is in the Legislature, subject only to constitutional restraint. In *Russell* v. *Robinson, supra,* the Supreme Court of Alabama said:

"Counties are political subdivisions of the state, created for public convenience in the administration of government. Their territorial limits are fixed by the Legislature, and outside of constitutional provisions whatever of jurisdiction and powers they possess are derived from the same source. They have no power or authority to alter or change their territorial limits or boundary lines. This is a right reserved to the Legislature of the State, and to be exercised in the way prescribed in the Constitution."

In the latter case of *Elmore County* v. *Tallapoosa County,* 131 So. 552, the Supreme Court of Alabama said:

"If a boundary line of a county can be determined as a question of law, acquiescence in another line by contiguous counties is immaterial. Acquiescence can be considered only where there is uncertainty because of a conflict in the calls, descriptions, or monuments employed in the act fixing the line; . . ."[29]

In the case at bar the legislative Act of 1861 fixed the dividing line of the Poteau Mountain range in Townships 31, 32 and 33 as the common boundary line between Scott and Sebastian Counties. Such was a *definite* legislative determination, and no amount of recognition or acquiescence can change that boundary line as fixed by the Legislature.

---

[29] See 20 C. J. S. 773 where may be found other cases expressing the same views.

Conclusion: The decree of the Chancery Court is correct in all respects, and is accordingly affirmed.

MILLWEE, J., dissents.

TOP OF POTEAU MOUNTAIN
NORTH LINE OF TOWNSHIP THREE

SEBASTIAN COUNTY

R 31 W

R 32 W

R 33 W

TWP 3 N

N.

OKLA.

ARK.

SCOTT COUNTY

DIAGRAM SHOWING THE AREA IN DISPUTE, BEING ALL THAT PART OF RANGES 31, 32 AND 33 LYING NORTH OF POTEAU MOUNTAIN AND SOUTH OF THE NORTH LINE OF TOWN— SHIP THREE.