## BANK OF CHINA v. WELLS FARGO BANK & UNION TRUST CO.

### No. 29287.

United States District Court
N. D. California, S. D.
July 17, 1950.

A. Crawford Greene, Morris M. Doyle, Owen Jameson, all of San Francisco, Cal., James B. Burke, New York City, McCutchen, Thomas, Matthew, Griffiths & Greene, San Francisco, Cal., Burke & Burke, New York City, of counsel, for plaintiff.

Dreyfus & McTernan, Benjamin Dreyfus, and Francis J. McTernan, Jr., all of San Francisco, Cal., Wolf, Popper, Ross & Wolf, Martin Popper, all of New York City, Robert W. Kenny, Los Angeles, Cal., attorneys seeking to be substituted as attorneys for plaintiff.

Heller, Ehrman, White & McAuliffe, Lloyd W. Dinkelspiel, Martin Minney, Jr., all of San Francisco, Cal., for defendant.

GOODMAN, District Judge.

For several years prior to the institution of this action on November 9, 1949, Bank of China, Shanghai was a depositor in defendant Wells Fargo Bank & Union Trust Co. It now has to its credit the sum of $626,860.07.

The Bank of China is a corporation established in 1912 under the laws of China. Two-thirds of its stock is held by the Government of China, and the remainder by Chinese nationals. It is governed by a board of 25 directors, 13 appointed by the Government, and 12 elected by the private stockholders. The Articles of Association provide that the Head Office shall be maintained at Shanghai. Branch offices are maintained throughout the territorial mainland of China and abroad.

At the time that the Shanghai office of the Bank of China opened its account with Wells Fargo, and subsequently, facsimiles of signatures of those persons authorized to draw on the account were furnished Wells Fargo. Withdrawals were made from the account either by authenticated cable from the office in whose name the account was carried, or by letter carrying an authorized signature.

Near the end of April, 1949, when Chinese revolutionary forces neared Shanghai, the Head Office of the Bank of China was moved to Canton, presumably by the decision of the Board of Directors. On May 6, 1949, Wells Fargo received from the New York office of the Bank of China a copy of a cable from the Hong Kong office which canceled the cyphec keys previously used by the Shanghai office and stated that thereafter all orders for payment would be executed by the foreign department of the Hong Kong office. On May 24, 1949, Wells Fargo received a letter from the Head Office at Canton announcing the transfer of the Foreign Department of the Bank from Shanghai to Hong Kong and revising the list of facsimiles signatures of officers authorized to sign on behalf of the Bank.

Subsequently the Head Office, itself, was transferred to Hong Kong.

On June 27, 1949, Wells Fargo received a cable from Shanghai informing it that the Bank of China had been taken over on May 28, 1949 by the Chinese Peoples Liberation Army and that the powers of its Board of Directors had been temporarily vested in East China Financial and Economic Affairs Administration. In this cable all specimen signatures then on file with Wells Fargo were revoked and Wells Fargo was directed to make no payment except by order from the Shanghai office. On July 21, 1949 a cable was sent to Wells Fargo from Shanghai announcing the appointment of Kung Ying Ping as the new General Manager of the Head Office of the Bank of China, and Chi Chao Ting as the new Manager of its Foreign Department.

On October 7, 1949, Wells Fargo received a cable from the Hong Kong office of the Bank of China directing that $600,000 be remitted to the New York office of the Bank of China. Upon inquiry by the New York office whether this order had been received, Wells Fargo telegraphed on October 15, 1949, that it had, but that the conflicting claims of corporate authority made payment impossible. Subsequently a further demand was made on Wells Fargo, presumably by the Hong Kong office, for payment of the entire balance of $626,860.07 held for the account of the Bank of China, Shanghai. Wells Fargo again refused to pay. On instruction of Hsi Te Mou, a managing director and the General Manager of the Bank, then in New York, T. Y. Lee, the manager of New York office, directed certain attorneys to file this action against Wells Fargo to recover the deposit. Suit was filed November 9, 1949 in the name of the Bank of China. Wells Fargo answered on December 5, setting up the conflicting claims of authority to receive payment. On December 9, 1949, a motion for summary judgment was filed by the attorneys who instituted the action. On December 19, the motion was heard and the cause was set for trial on December 29. Subsequently the trial was reset for February 1, 1950.

On January 26, 1950, a second group of attorneys, claiming that they were the only attorneys empowered to represent the Bank of China, filed a motion to dismiss this action or to substitute themselves as the attorneys of record. On January 30, 1950 when the motion was heard these attorneys appeared, and alleged the facts set out in the next paragraph as proof of their authority to speak for the Bank of China.

On May 28, 1949, the Bank of China, in so far as was physically possible, was taken over by the Chinese Peoples Liberation Army and the powers of its Board of Directors were temporarily vested in the East China Financial and Economic Affairs Administration. This Administration on June 6, 1949 appointed Kung Ying Ping General Manager and Chi Chao Ting and Chan Wu Assistant General Managers. After the overthrow of the Nationalist Government in China and the establishment of the Central Peoples Government in October, 1949, the powers of the Board of Directors of the Bank of China were transferred temporarily to the Financial and Economic Affairs Commission of the Central Government. Subsequently the Peoples Government, by virtue of the stock ownership to which it claimed to have succeeded as the successor of the Nationalist Government, appointed new government directors. On December 24, 1949, the Peoples Government announced that a meeting of the new directors of the Bank of China would be held in Peking upon the arrival of directors elected by the private stockholders. Also on December 24, 1949, the moving attorneys received a cable from Peking signed by Kung Ying Ping, Chi Chao Ting and Chan Wu, the recently appointed managers of the Bank, authorizing them to act as the attorneys for the Bank of China in the present action.

The attorneys for the émigré directors countered these allegations of fact with the assertion that the Nationalist Government now operating from Formosa is the only government of China recognized by the United States. This Court, they urged, cannot recognize any change in the management of the Bank of China resulting from

acts of a government unrecognized by the United States.

\* \* \* \* \* \*

 Controversies regarding property rights rendered uncertain by changing governments have produced a myriad of judicial decisions. These decisions present a confusing picture. No area of that picture is more murky than that depicting the effect of the recognition or non-recognition of a new government by the forum nation. Research reveals no case, with facts sufficiently similar to those of the present controversy, to be accepted as a controlling precedent. But some general principles may be deduced from prior decisions to shape the approach to the present problem. The first guide post is the not too helpful principle that the action of the political department of the government "in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination, although they are free to draw for themselves its legal consequences in litigations pending before them." Guaranty Trust Co. of New York v. United States, 1938, 304 U.S. 126, 138, 58 S.Ct. 785, 791, 82 L.Ed. 1224. One of the accepted consequences is that a non-recognized government cannot be recognized by the court as a litigant. Guaranty Trust Co. of New York v. United States, supra, 304 U.S. at 137, 58 S.Ct. 785, 82 L.Ed. 1224. But, it does not follow that the existence of a non-recognized government must be completely ignored. The courts of the United States have given effect to the acts of a non-recognized, de facto government done within the territory it controls and affecting its own nationals. This effect has been given when it has appeared that the most realistic and just result will thus be achieved and that the foreign policy of the executive

branch of our government will not be thwarted.[1]

The funds here in controversy belong to a Chinese corporation, which has weathered previous governmental upheavals. Although by virtue of majority stock ownership, the Government of China controls this corporation, it is not a public corporation nor are its funds government funds. These funds are committed to the accomplishment of the corporate purposes. The corporation was established to carry on a general banking business, including the granting of commercial credits, the discounting of bills and drafts, the purchase and sale of bullion and foreign currencies, the acceptance of deposits and valuables for safekeeping, the collection of bills, and the granting of loans against reliable securities. The bank operates through 200 branches throughout China. It maintains 20 foreign offices for the express purpose of facilitating trade between the Chinese people and the rest of the world. The Bank of China cannot perform its functions while divorced from the Chinese nation. Its depositors, its 5,000 private stockholders, and the Chinese people—who may be characterized as the ultimate owners of the government stockholdings—must live under the government which in fact governs throughout the territorial limits of China.

The émigré directors of the Bank are now scattered. Some are in New York, others in California, others in Formosa, others in Hong Kong, still others in Shanghai, and Hangchow. The whereabouts of some is unknown. Some of these directors represent a government which is not now, and may never again be, in a position to speak for the Chinese people in respect to the manner in which the corporation shall function in China. The others, may or may not be the directors whom the private

---

1. Among the decisions which have developed the theme of limited recognition of the acts of an unrecognized but de facto government are: Thorington v. Smith, 1868, 8 Wall. 1, 75 U.S. 1, 19 L. Ed. 361; United States v. Insurance Companies, 1874, 22 Wall. 99, 89 U.S. 99, 22 L.Ed. 816; Baldy v. Hunter, 1898, 171 U.S. 388, 18 S.Ct. 890, 43 L.Ed. 208; Russian Reinsurance Co. v. Stoddard, 1925, 240 N.Y. 149, 147 N.E. 703; Banque de France v. Equitable Trust Co., D.C.1929, 33 F.2d 202; In re People (In re Claim of Dougherty), 1931, 255 N.Y. 428, 175 N.E. 118; M. Salimoff & Co. v. Standard Oil Co., 1933, 262 N. Y. 220, 186 N.E. 679, 89 A.L.R. 345; The Denny, 3 Cir., 1942, 127 F.2d 404.

stockholders now desire to speak for them. It is difficult to perceive how the interests of the corporation, its stockholders, and its depositors will be protected by placing the res in dispute at the disposal of a group of these directors.[2]

To deny the émigré directors control of these funds is not to deprive a government, still recognized by the United States, of funds to carry on its fight for survival. For these are corporate funds which should not be dissipated for purposes other than those of the corporation.

On the other hand, the new management in China is not yet so established as to warrant placing these funds in its hands. Who the private stockholders wish to represent them is at present unknown. The new government directors represent a government, which although in control of the Chinese mainland, has not yet put down all organized resistance. Only time will tell whether this government will become a stable government.

Furthermore, recent international developments bar any decision of this Court which would place these funds in the control of the new management of the bank in China. For this Court to recognize the acts of the so-called "Peoples Government," in so far as they relate merely to a Chinese corporation which must function under that government, might not necessarily run counter to a merely negative policy of non-recognition on the part of the United States. But, since the announcement of the President on June 27, 1950, that the United States will defend Formosa (the present seat of the de jure Chinese government) the policy of the United States appears to be one of active intervention against the aims of the "Peoples Government."[3] Although the Bank of China is a private corporation, the Court must realistically recognize that if the $626,860.07 in controversy were placed in the hands of the new management of the Bank of China, the "Peoples Government" would be aided and abetted.

■ The only solution which gives promise of affording protection to the Bank of China, its stockholders, and depositors, and at the same time supporting the foreign policy of the United States, is to leave these funds where they are for the present. A Court cannot justly rule while a controversy is raging, except to maintain the status quo. A man fording a turbulent stream carrying valuables, cannot be expected then and there to decide the claims of disputing consignees. It is time enough to make decision when solid ground is reached. In the field of international relations, the story must be complete, the facts must be all in, before the judicial function may be properly exercised. Particularly is this so when events are colored by problems of governmental recognition. United States v. Pink, 1942, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796. Justice Frankfurter concurring 315 U.S. at 236-237, 62 S.Ct. 552, 86 L.Ed. 796, Justice Stone dissenting 315 U.S. at 256, 62 S.Ct. 552, 86 L.Ed. 796.

Therefore, the trial of this cause will be continued sine die. The defendant, if it desires to preclude any claim against it for interest for the use of the fund, may either deposit the fund in the registry of the Court, or place the same in a separate trust account in form to be approved by the Court.

The motions for summary judgment, to dismiss and for substitution of attorneys, are severally denied without prejudice.

Counsel will present an order accordingly.

2. Note the somewhat similar situation in Russian Reinsurance Co. v. Stoddard, 1925, 240 N.Y. 149, 147 N.E. 703, and Andre v. Beha, 2d Dep't 1925, 211 App. Div. 380, 208 N.Y.S. 65, affirmed 1925, 240 N.Y. 605, 148 N.E. 724.

3. This is so even though the President, with obvious intent to maintain the status quo, also stated that the United States would not permit Chinese Nationalist forces in Formosa to invade Continental China.

The President's statement of United States' policy respecting the Chinese civil war was made in conjunction with his announcement that the United States, at the request of the United Nations, would aid South Korea in defending herself against the invading Communist forces of North Korea.